Argued and submitted February 25, affirmed on appeal and cross-appeal
November 10, 2010

Bryn HAZELL,
Francis Nelson, Tom Civiletti, David Delk,
Gary Duell, Joan Horton, and Ken Lewis,
*Plaintiffs-Appellants*
*Cross-Respondents,*

*v.*

Kate BROWN,
Secretary of State of the State of Oregon;
and John R. Kroger,
Attorney General of the State of Oregon,
*Defendants-Respondents*
*Cross-Respondents,*

*and*

CENTER TO PROTECT FREE SPEECH, INC.,
an Oregon nonprofit corporation;
and Fred Vannatta,
*Intervenors-Respondents*
*Cross-Appellants.*

Marion County Circuit Court
06C22473; A137397

242 P3d 743

Daniel W. Meek argued the cause and filed the briefs for appellants-cross-respondents Bryn Hazell, Francis Nelson, Tom Civiletti, David Delk, and Gary Duell.

Linda K. Williams argued the cause and filed the briefs for appellants-cross-respondents Joan Horton and Ken Lewis.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondents-cross-respondents. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

John A. DiLorenzo, Jr., Gregory A. Chaimov, and Davis Wright Tremaine LLP filed the briefs for respondents-cross-appellants.

James Nicita filed the brief *amicus curiae* for Elizabeth Trojan and Fair Elections Oregon.

Eric C. Winters filed the brief *amicus curiae* for The Better Government Project.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

This appeal, from the denial of plaintiffs' and intervenors' motions for summary judgment and allowance of defendants' cross-motion for summary judgment, centers on the validity and operation of Ballot Measure 47 (2006), now codified as a note at ORS chapter 259, which, among other things, contains various provisions limiting or prohibiting political campaign contributions and expenditures. We conclude that the trial court correctly rejected each of plaintiffs' and intervenors' challenges. Accordingly, we affirm.

## I. BACKGROUND

Measure 47 and its companion measure, Ballot Measure 46 (2006), were presented and considered by the voters against the backdrop of the Oregon Supreme Court's decision in *Vannatta v. Keisling*, 324 Or 514, 931 P2d 770 (1997) (*Vannatta I*), which invalidated certain provisions of Ballot Measure 9 (1995) and sustained other provisions. Given that context, we pause briefly to describe the Oregon Supreme Court's treatment in *Vannatta I* of the essential features of Measure 9.

Measure 9 imposed mandatory limits on contributions to state political campaigns and voluntary limits on campaign expenditures. *Vannatta I* involved a challenge to those limitations brought under Article I, section 8, of the Oregon Constitution. *Vannatta I*, 324 Or at 536-45. Ultimately, the Oregon Supreme Court concluded that political contributions and expenditures are "both * * * forms of expression for the purposes of Article I, section 8." *Id.* at 524. Given that conclusion, the court held that the mandatory limitations on political contributions were unconstitutional, but upheld the limitations pertaining to expenditures because of their noncompulsory character.[1] *Id.* at 541, 543-45.

---

[1] The Oregon Supreme Court recently revisited and clarified some of its reasoning in *Vannatta I* in *Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 465, 222 P3d 1077 (2009), *cert den*, ___ US ___ , 130 S Ct 3313 (2010) (*Vannatta II*), and *State v. Moyer*, 348 Or 220, 230, 230 P3d 7, *cert den*, ___ US ___ , 131 S Ct 326 (2010). We discuss those clarifications below. *See* 238 Or App at 511 n 15.

In the November 2006 general election, Oregon voters again considered whether to adopt restrictions on campaign contributions and expenditures. Two ballot measures were proposed: Measure 46 and Measure 47, the measure at issue in this case. Measure 46 proposed amending the Oregon Constitution to allow statutory enactments, adopted through the initiative process or through a three-fourths vote of both houses of the legislature, that "prohibit or limit contributions and expenditures, of any type or description, to influence the outcome of any election." The ballot title to Measure 46 reflected voters' understanding of the then-existing state of the law; it stated: "The Oregon Constitution currently bans laws that impose involuntary limits on, or otherwise prohibit, political campaign contributions or expenditures by any person or any entity," and warned that a "no" vote would "retain[ ] [the] current ban in [the] Oregon Constitution on laws that limit or prohibit campaign contributions or expenditures by any person or any entity."

Measure 47, which proposed such a statutory enactment, is similar in significant respects to Measure 9. Specifically, Measure 47 limits the amount a person or political committee may contribute to a candidate, political committee, or political party, Measure 47 § (3)(d) - (i), limits the contributions a candidate may make to his or her own committee, *id.* § (4)(a), and prohibits candidates from making loans to their own campaign committees, *id.* § (4)(d). It also, with certain exceptions, bans corporations, labor unions, and certain individuals from making contributions, *id.* § (3)(a), (j), and prohibits campaigns and political parties from accepting contributions that are in excess of, or prohibited by, what is provided for in Measure 47, *id.* § (3)(c).

However, unlike Measure 9, Measure 47 also imposes mandatory limits on political expenditures. For example, with certain exceptions, it limits the amount a person may spend to directly communicate their support or opposition towards a political candidate or party, Measure 47 § (6)(b) - (d), and prohibits such expenditures by corporations, labor unions, and certain individuals, with exceptions, *id.* § (6)(a), (d). Measure 47 also limits the amount that candidates, political committees, and other entities may spend to oppose or support a candidate or party to that amount

received in accordance with the contribution provisions. *Id.* §§ (5), (6)(e) - (f).

In addition to the contribution and expenditure provisions, Measure 47, *inter alia*, contains various, ancillary disclosure and reporting requirements, *see, e.g., id.* §§ (4)(b), (6)(f) - (h), delineates how the state is to administer, track, and report information about candidates' contributions and expenditures to the public, *id.* § (8), and imposes penalties for violations of the contribution and expenditure limitations and other, related restrictions, *id.* § (10).

Aside from those sections governing substantive matters, Measure 47 also contains several "savings provisions." One of those provisions lies at the core of this dispute—indeed, it is the ultimate object of virtually all of the parties' contentions. That provision, section (9)(f), provides:

"If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations."

On November 7, 2006, Oregon voters enacted Measure 47, but rejected Measure 46, the companion measure that had proposed the constitutional amendment. In light of the unofficial results from that election, on November 17, 2006, the Secretary of State announced that,

"[b]ecause Measure 46 was not approved by the people, the conditions required by Section (9)(f) for the rest of Measure 47 to become operative will not have been fulfilled * * *. Accordingly, the effect of Section (9)(f) is that no part of the measure presently is enforceable. According to the plain, natural, and ordinary meaning of the words of Section (9)(f), all of Measure 47 will remain dormant until such time as 'the Oregon Constitution is found to allow, or is amended to allow,' limitations on campaign contributions and expenditures."

Thus, although the Governor proclaimed Measure 47 to be in "full force and effect" on December 7, 2006, as provided in

Article IV, section 1, of the Oregon Constitution,[2] defendants have refused to implement or enforce the measure.

On December 27, 2006, plaintiffs Hazell, Nelson, Civiletti, Delk, and Duell (the Hazell plaintiffs) and plaintiffs Horton and Lewis (the Horton plaintiffs) brought this action for declaratory and injunctive relief, seeking the implementation and enforcement of Measure 47. Specifically, the Hazell plaintiffs sought declarations that defendants, the Secretary of State and Attorney General, are "obliged to administer and enforce each and all of the provisions of Measure 47" and that, by its terms, section (9)(f) does not excuse that obligation. The Horton plaintiffs, on the other hand, sought declarations that section (9)(f) is invalid under Article IV, section 1(4)(d), but that the balance of Measure 47 must be enforced. In addition to their separate contentions as to the validity and operation of section (9)(f), all plaintiffs jointly argued that the Oregon Supreme Court's decision in *Vannatta I* does not preclude enforcement of any or all of Measure 47 and, in the alternative, that *Vannatta I* was wrongly decided.

Center to Protect Free Speech, Inc., and Vannatta intervened, contending that section (9)(f) makes the "effective" date of the act contingent on conditions prohibited by Article I, section 21, of the Oregon Constitution[3] and, thus, Measure 47, in its entirety, "is void and of no effect."

The parties filed cross-motions for summary judgment, and, in a comprehensive letter opinion, the trial court rejected plaintiffs' and intervenors' motions for summary judgment and allowed summary judgment for defendants. The trial court subsequently entered a general judgment reiterating its ruling and disposing of the parties' claims as follows:

"(1) Contrary to the declaration sought by intervenor-defendants in their cross-claim against defendants,

___

[2] Article IV, section 1(4)(d), provides, in pertinent part, that "an initiative or referendum measure becomes effective 30 days after the day on which it is enacted or approved by a majority of the votes cast thereon."

[3] Article I, section 21, provides that "[n]o * * * law [shall] be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution[.]"

Measure 47 (2006) is not unconstitutional under Article I, § 21, of the Oregon Constitution;[4]

"(2)  Contrary to the declaration sought by the Horton plaintiffs, § (9)(f) of Measure 47 is not unconstitutional, and defendants therefore did not err by implementing that section according to its terms;

"(3)  Contrary to the declaration sought by plaintiffs, the operative effect of Measure 47 is deferred in the present circumstances by the terms of § (9)(f), such that Measure 47 is not presently operative;

"(4)  Consistent with the position asserted by defendants, § (9)(f) validly defers Measure 47's operative effect in the present circumstances, such that Measure 47 is not presently operative;

"(5)  Plaintiffs' complaint is otherwise dismissed with prejudice;

"(6)  Intervenor-defendants' cross-claim against defendants is otherwise dismissed with prejudice; and

"(7)  Defendants are entitled to their costs and disbursements incurred herein."

Plaintiffs appealed and intervenors cross-appealed, both groups assigning error to the denial of their own motions and the granting of defendants' cross-motion for summary judgment. The Horton plaintiffs also assign error to the denial of the Hazell plaintiffs' motion for summary judgment, in which they had joined. On appeal, The Better

---

[4] The trial court elaborated on its determination that Measure 47 is not unconstitutional under Article I, section 21, in its letter opinion. As amplified below, intervenors argued that both of the contingencies in section (9)(f) that could animate Measure 47's operation—*viz.*, a subsequent constitutional amendment or a decision by a court that campaign contribution and expenditure limits are constitutionally permissible—independently violated Article I, section 21. The trial court reasoned that the first contingency, authorization of Measure 47 through a subsequent constitutional amendment, was permitted under the Oregon Supreme Court's rationale in *State v. Hecker*, 109 Or 520, 221 P 808 (1923), discussed below. However, the trial court believed that the alternative contingency, a subsequent decision by a court holding limitations on campaign contributions and expenditures constitutionally permissible, may be constitutionally problematic because "it relies on the activity of a third party, rather than the legislative process to give effect to the legislation." That said, the trial court reasoned that it "need not decide whether the measure's operative effect can be made to depend on a judicial finding," because it could strike that clause under ORS 174.040 and give effect to the balance of section (9)(f).

Government Project, and Elizabeth Trojan and Fair Elections Oregon have filed briefs as *amici curiae*.

## II. THE MERITS

■  "When there are cross-motions for summary judgment and the granting of one and denial of the other are both assigned as error, both are subject to review." *Farmers Ins. Exchange v. Crutchfield*, 200 Or App 146, 152-53, 113 P3d 972, *rev den*, 339 Or 609 (2005). *See also Employers-Shopmens Local 516 v. Travelers*, 235 Or App 573, 581, 235 P3d 689 (2010). Where there are no issues of material fact, as in this case, we review a trial court's summary judgment ruling on each motion for errors of law. *See Dept. of Forestry v. PacifiCorp*, 236 Or App 326, 332, 237 P3d 861, *adh'd to as modified on recons*, 237 Or App 228, 239 P3d 503 (2010).

A.  *Intervenors' Challenge Under Oregon Constitution, Article I, section 21*

Intervenors contend that Measure 47 is void in its entirety, because section (9)(f) violates Article I, section 21. Article I, section 21, provides, in part, that "[n]o * * * law [shall] be passed, the *taking effect* of which shall be made to depend upon any authority, except as provided in this Constitution[.]" (Emphasis added.) Again, section (9)(f) provides:

> "If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and *shall become effective* at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations."

(Emphasis added.)

The crux of intervenors' argument is that, because "Article I, section 21 prohibits making the effectiveness of a law dependent on a change in the interpretation *or* terms of the constitution[,] * * * the inclusion of either one of those contingencies" results in an unconstitutional delegation of the legislative power to another branch of government. (Emphasis in original.) Intervenors further argue that, as a result of that purported defect, Measure 47 was not lawfully adopted and the entire act must be invalidated.

■ The constraints of Article I, section 21, apply only to the delegation of the legislative authority to enact laws—that is, "the constitutional function of the legislature to declare whether there is to be a law; and, if so, what are its terms." *Marr v. Fisher et al*, 182 Or 383, 388, 187 P2d 966 (1947). Accordingly, although consistently with Article I, section 21, "the legislature cannot delegate its power to make a law, it is well settled that it may make a law to become operative on the happening of a certain contingency or future event." *Id.*

Thus, intervenors' challenge under Article I, section 21, ultimately turns on a question of statutory interpretation. Specifically, what is the meaning of the term "shall become effective" as used in section (9)(f)? In particular, does that term refer (unconstitutionally) to the "law-making power," or (constitutionally) to provision for the law "to become operative on the happening of a certain contingency or future event"? *Marr*, 182 Or at 388.

According to intervenors, "shall become effective" means that the measure will not *become law* unless or until the occurrence of either of the contingencies specified in section (9)(f). Defendants remonstrate that "shall become effective" connotes when the measure will become *operative*. As support for that construction, defendants emphasize that the design and language of section (9)(f)—*viz.*, "shall nevertheless be *codified and* shall become effective at the time" (emphasis added)—treats "codified" and "become effective" as independent and distinct concepts. *Cf. State v. Hecker*, 109 Or 520, 546-47, 221 P 808 (1923) (construing the phrase "shall take effect" to refer to the law's "active operation" and upholding the law, so construed, against a constitutional challenge).

■ In construing the meaning of a statute enacted by initiative, we apply the standard principles of statutory construction set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), as modified by ORS 174.020. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *see also Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994) (applying principles to constitutional amendment adopted through the initiative process); *Friends of Yamhill County v. Board of*

*Commissioners*, 237 Or App 149, 166-67, 238 P3d 1016 (2010) (applying principles to interpretation of a statute enacted by referendum post-*Gaines*). Our task is to discern what the voters intended when they enacted section (9)(f), which we derive by first looking to the text and context of the section, taking into account any history of the measure that we find useful to our analysis. *Gaines*, 346 Or at 172; *Friends of Yamhill County*, 237 Or App at 166. The "best evidence" of what the voters intended when they enacted section (9)(f), however, is "the text of the provision itself." *Ecumenical Ministries*, 318 Or at 559 (internal quotation marks omitted).

■     Applying those principles, we conclude, as defendants urge, that "shall become effective" in section (9)(f) refers not to the measure's enactment, but to its operation. That is so for several reasons.

We acknowledge, at the outset, that the term "effective" in abstract isolation could, plausibly, bear either of the contending constructions. *See Webster's Third New Int'l Dictionary* 724 (unabridged ed 2002) (defining "effective" as, *inter alia*, "capable of bringing about an effect," "able to accomplish a purpose," "taking effect : valid, operative").[5]

However, as defendants emphasize, "effective" does not stand in stark isolation in section (9)(f)—and contextual

---

[5] Significantly, the plain and common meaning of "effective" also aligns with the common legal definition for the term. *See Black's Law Dictionary* 554 (8th ed 2004) (defining effective, with regards to a statute, to mean "in operation at a given time"); *see also Shineovich and Kemp*, 229 Or App 670, 683 n 13, 214 P3d 29, *rev den*, 347 Or 365 (2009) (where "there is no conflict between the legal meaning and the ordinary meaning, * * * we need not determine which meaning the voters intended").

Nonetheless, intervenors maintain that "effective" is a legal term of art that connotes "to become law." Intervenors invoke various legislative enactments containing contingencies that recognize the distinction between the acts' effective dates versus their dates of active operation. *See, e.g.*, Or Laws 2003, ch 801, § 25(1) (amendment to "become operative" contingent upon future judicial interpretation). Intervenors also draw attention to legislative history and to various legislative drafting guides that draw the same distinction, such as the Legislative Administrative Committee's *Form and Style Manual for Legislative Measures* and the Legislative Counsel Committee's Bill Drafting Manual, which, in their view, also supports their contention. However, nothing in the text, context, or history of section (9)(f) indicates that voters were aware of the specialized meaning given to "effective" by the Oregon legislature—much less that they intended "effective," as it is used in section (9)(f), to connote such a narrow, particularized meaning.

reference to the balance of the section is not merely illuminating, but conclusive. As noted, section (9)(f) treats "codified"[6] and "shall become effective" as two distinct concepts. The former is to occur *regardless of whether* the Oregon Constitution, as construed in *Vannatta I*, "does not allow limitations on political campaign contributions or expenditures." Measure 47, § (9)(f). The latter is not to occur *unless or until* the Oregon Constitution "is found to allow, or is amended to allow, such limitations." *Id.* Thus, given the content and design of section (9)(f), the only plausible construction of that provision is that its "shall become effective" language pertained not to enactment but, instead, solely to when the measure would become operative. Accordingly, the provision does not violate Article I, section 21.

Our conclusion in that regard comports with, and is buttressed by, *Hecker*, in which the Oregon Supreme Court gave similar effect to similar "shall take effect" language. In *Hecker*, the defendant challenged recently enacted legislation governing the execution of the death penalty, arguing that the legislation was unconstitutional because the Oregon Constitution prohibited the death penalty at the time the legislation was enacted.[7] 109 Or at 542-43, 546. The legislation at issue, Oregon Laws 1920, chapter 20, became law on April 17, 1920,[8] whereas the constitutional amendment reinstating the death penalty became effective on June 18, 1920. *Id.* at 538, 545.

Critically, however, the contested statute contained the following provision:

" 'This act shall *take effect* as soon as and whenever the constitutional provisions * * * of the state of Oregon relating to the death penalty, and any amendment or amendments thereto, will permit.' "

---

[6] To "codify" is pertinently defined to mean "to reduce to a code (as laws)." *Webster's* at 438.

[7] In 1914, Oregonians adopted a constitutional amendment prohibiting the death penalty. *Hecker*, 109 Or at 532. Before that time, the Oregon Constitution was silent as to whether the death penalty was lawful, but various statutes provided for a penalty of death. *Id.* at 532-33.

[8] The *Hecker* court assumed, for the benefit of the defendant's argument, that the legislature was powerless to extend the effective date of Oregon Laws 1920, chapter 20, beyond the 90-day period provided for in Article IV, section 28, of the Oregon Constitution. *Id.* at 545.

*Hecker*, 109 Or at 539 (quoting Or Laws 1920, ch 20, § 4) (emphasis added). Thus, the plain language of that section appeared to indicate that the statute would *become law* once the Oregon Constitution was amended to permit the death penalty. Accordingly, the court considered whether that provision was an invalid attempt by the legislature to extend the statute's effective date beyond the 90-day period provided for in Article IV, section 28, of the Oregon Constitution (providing that "[n]o act shall take effect[ ] until ninety days from the end of the session").

Rejecting that contention, the Oregon Supreme Court construed the phrase "take effect" in the statute to refer, instead, to the statute's "active operation." *Hecker*, 109 Or at 546. The court reasoned:

"A measure may become a law on a determined date, and yet that law may not go into active operation until some later date or until the happening of some contingency. When a measure having no emergency clause passes through the hands of the legislature and when it becomes a complete and perfect law upon the expiration of the ninety days period [in Article IV, section 28,] nothing more is required to make it a law; and yet something may be required to bring it into operation. The measure takes effect as a law in the sense that it is a complete act of law making when the ninety days expire, but its active operation may be made dependent upon some contingency."

*Id.* at 545-46. So construed, Oregon Laws 1920, chapter 20, did not violate the unamended version of the Oregon Constitution "because the operation of Chapter 20 was by its own restraining language absolutely prevented from operating and hence from running counter to the then Constitution" and "could not by force of its own terms operate until the then Constitution should be amended." *Id.* at 547.

As in *Hecker*, and consistently with the complete context of section (9)(f), we construe "shall become effective" in that section to refer to the act's *operation*, as opposed to the date of its enactment. Thus, Measure 47 "[took] effect as a law in the sense that it [was] a complete act of law making," *see Hecker*, 109 Or at 546, on December 7, 2006, as the Governor proclaimed, and consequently, is not unconstitutional under Article I, section 21.

B. *The Horton Plaintiffs' Challenge Under Oregon Constitution, Article IV, section 1(4)(d)*

We proceed to the Horton plaintiffs' contention that section (9)(f) violates Article IV, section 1(4)(d). That section provides, in relevant part:

"[A]n initiative or referendum measure becomes effective 30 days after the day on which it is enacted or approved by a majority of the votes cast thereon."

As we understand their argument, the Horton plaintiffs propose that section (9)(f) contravenes the requirements of Article IV, section 1(4)(d), in three distinct ways. We consider only two of those contentions and reject the Horton plaintiffs' third argument, as well as subsidiary arguments that the Horton plaintiffs raise under Article IV, section 1(2), without discussion.

The Horton plaintiffs also contend that, if we agree that section (9)(f) is unconstitutional, the proper remedy is to sever section (9)(f) from Measure 47, pursuant to section (11) of that measure,[9] and enforce the balance of Measure 47. As amplified below, because we conclude that there is no constitutional violation, we do not reach the Horton plaintiffs' severance argument.

The Horton plaintiffs' first argument draws on the Supreme Court's decisions in *Smith v. Cameron et al*, 123 Or 501, 262 P 946 (1928), and *People's Util. Dist. et al v. Wasco Co. et al*, 210 Or 1, 305 P2d 766 (1957), which collectively stand for the principle that statutes held unconstitutional may not be revived by a subsequent constitutional amendment unless that amendment "clearly manifests an intent" to revive the earlier, unconstitutional statute. *People's Util.*

---

[9] Measure 47, section (11), provides:

"The provisions of this Act shall supersede any provision of law with which they may conflict. For the purpose of determining constitutionality, every section, subsection, and subdivision thereof of this Act, at any level of subdivision, shall be evaluated separately. If any section, subsection or subdivision at any level is held invalid, the remaining sections, subsections and subdivisions shall not be affected and shall remain in full force and effect. The courts shall sever those sections, subsections, and subdivisions necessary to render this Act consistent with the United States Constitution and with the Oregon Constitution. Each section, subsection, and subdivision thereof, at any level of subdivision, shall be considered severable, individually or in any combination."

*Dist.*, 210 Or at 13. The Horton plaintiffs contend that section (9)(f)'s instruction that Measure 47 shall become operative whenever "the Oregon Constitution * * * is amended to allow[ ] such limitations" violates that principle because there is no assurance that the future constitutional amendment will "clearly manifest[ ] an intent" to revive Measure 47.

■ The flaw in the Horton plaintiffs' argument, as defendants point out, is that the principles announced by the Supreme Court in *Smith* and *People's Util. Dist.* do not apply here. The statutes involved in those cases were both legally and operationally effective before they were declared unconstitutional; they did not possess a mechanism akin to section (9)(f) that would postpone their operation until it fit within constitutional parameters. Here, pursuant to section (9)(f), Measure 47 is not operative and, therefore, was not void for want of constitutionality on the date of its enactment. *See Hecker*, 109 Or at 547 (upholding as constitutional a law that "by its own restraining language [was] absolutely prevented from operating and hence from running counter to the then Constitution"). Accordingly, the requisite subsequent constitutional amendment would not retroactively "re-enact" Measure 47—the circumstance *Smith* and *People's Util. Dist.* pertain to—but, rather, would trigger the validly enacted law's operation.

The Horton plaintiffs' second argument is that section (9)(f) is unconstitutional under Article IV, section 1(4)(d), because it predicates the operation of Measure 47 on some future amendment to the constitution that may never occur, as opposed to the outcome of an anticipated or scheduled election on such an amendment. For support, the Horton plaintiffs rely on case law that, in their view, endorses their position that, when legislation is enacted but remains dormant until some contingency triggers its operative effect, there must be a "date certain" by which the contingency is fulfilled or some other presently "anticipated event" by which the contingency is discharged. In particular, the Horton plaintiffs contend that that purported requirement is implicit in the Supreme Court's decisions in *Libby v. Olcott*, 66 Or 124, 134 P 13 (1913), *State v. Rathie et al.*, 101 Or 339, 199 P 169 (1921), *overruled in part on other grounds by State v. Brewton*,

238 Or 590, 395 P2d 874 (1964), *Hecker*, 109 Or 520, and *Marr*, 182 Or 383, because the fate of the dormant legislation at issue in those cases was to be decided at some specified, anticipated election.

Defendants counter that the Horton plaintiffs misunderstand the meaning and effect of Article IV, section 1(4)(d), and that none of the cases the Horton plaintiffs invoke stands for the proposition they rely on them for. Again, we agree with defendants.

As defendants note, the underlying premise of the Horton plaintiffs' argument is fundamentally misplaced. Article IV, section 1(4)(d), governs the *effective* date, not the *operative* date, of laws adopted by initiative or referendum. As discussed in section II.A above, which adopts an analysis in which the Horton plaintiffs purported to join, the *effective* date of Measure 47 was not subject to any contingency: Measure 47 became law on December 7, 2006, pursuant to Article IV, section 1(4)(d), even though section (9)(f) deferred its active operation.[10] Therefore, the contingency that the Horton plaintiffs take issue with simply does not implicate Article IV, section 1(4)(d).

The case law that the Horton plaintiffs invoke is unavailing. The unifying issue in *Libby, Rathie, Hecker,* and *Marr* was whether the legislature could validly enact legislation the operation of which was dependent upon some future, contingent event. *See Libby*, 66 Or at 129 (statute provided for a special election in the event that any act of the Twenty-Seventh Legislative Assembly was subsequently challenged by referendum); *Rathie*, 101 Or at 363 (legislation

---

[10] The Horton plaintiffs distinguish the position they take on intervenors' contentions in regards to Article I, section 21, and the arguments they present under Article IV, section 1(4)(d). They state:

"Only Intervenors urged that all of Measure 47 failed for violation of Oregon Constitution, Article [I, section 21]. Horton Plaintiffs argued against that proposition. Horton Plaintiffs' argument is based on Article IV, [section 1(4)(d)], and not on any distinction between 'effective' and 'operative.' "

(Underscoring omitted.) As defendants note, the Horton plaintiffs miss the point. It is precisely because there is a distinction between a statute's effective date and the date of its operative effect that contingent legislation may be enacted despite Article IV, section 1(4)(d)'s requirement that such legislation "become[ ] effective 30 days after the day on which it is enacted or approved by a majority of the votes cast thereon."

providing for a penalty of death for murder in the first degree to become operative upon adoption of a constitutional amendment reauthorizing the death penalty); *Hecker*, 109 Or at 544-47 (implicitly extending the rationale in *Rathie* to legislation proscribing the manner of executing the death penalty); *Marr*, 182 Or at 385-86 (operation of legislation resulting in higher personal income taxes made contingent on voter rejection of a referred Sales Tax Act). To be sure, in each of those cases, as the Horton plaintiffs note, the contingency that would trigger the operation of the challenged legislation was a proximate and known event. *See, e.g.*, *Rathie*, 101 Or at 363 (contested legislation contained emergency clause calling for a special election to be held on a specified date at which the constitutional amendment would be voted on). However, that circumstance, albeit common to each of those cases, was not material to their disposition. Rather, as defendants emphasize, the gravamen of the Supreme Court's reasoning in those decisions did not turn on the proximity or anticipated nature of the contingent event.

The court's rationale in *Hecker* is illustrative. There, the contested legislation contained a clause stating that it would become operative " 'as soon as and whenever' " the constitution and amendments thereto " 'will permit.' " 109 Or at 539 (quoting Or Laws 1920, ch 20, § 4). The same legislature that proposed the statute also referred a constitutional amendment to the ballot, which, if adopted, would allow the statute to take operative effect. *Id.* at 536-38. Although, at the time the statute was enacted, the election on the constitutional amendment was forthcoming, the contested statute's text did not refer to that circumstance—nor was the Supreme Court's rationale for upholding the statute predicated on that fact. By its terms, the statute would become effective "whenever" it became constitutional; it did not refer specifically to the pending election on the constitutional amendment. Likewise, in upholding the contingency, the Supreme Court did not refer to the proximity of the election: "A measure may become a law on a determined date, and yet that law may not go into active operation until *some later date* or until the happening of *some contingency.*" *Id.* at 545 (emphases added). The necessary implication of the court's statement that the statute was valid even though it was to

remain dormant until "some later date" or the happening of "some contingency" was that the contingency could occur at any time.

In sum, although *Libby*, *Rathie*, *Hecker*, and *Marr* all involved contingencies that were, in fact, anticipated at the time the challenged statutes were enacted, that fact had no bearing on the holdings or analyses in those cases.

Having determined that section (9)(f) survives the constitutional challenges raised by intervenors and by the Horton plaintiffs, one disputed matter remains: Regardless of section (9)(f)'s *constitutionality*, as a matter of statutory construction, what is its effect with respect to Measure 47's operation? In particular, what is the meaning of "limitations on political campaign contributions or expenditures" on which section (9)(f)'s application depends? We turn to those questions.

C. *Meaning and Operation of Section (9)(f)*

Before summarizing the parties' arguments, it is useful to restate the text of section (9)(f):

> "If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations."

Defendants argued, and the trial court agreed, that the referent "limitations on political campaign contributions or expenditures" were limitations akin to those deemed to be unconstitutional in *Vannatta I*. That is, unless or until (either by way of constitutional amendment or judicial decision) *Vannatta I* is abrogated, none of the substantive provisions of Measure 47 can become operative. To invoke an electrical metaphor, until that "switch" is thrown, the entire substantive structure remains "dark."

The Hazell plaintiffs, in our understanding, advance two related challenges to that construction and result. First, they contend that the "limitations" referred to in section (9)(f) are not those of the sort addressed in *Vannatta I*—but, instead, encompass all of those provisions in Measure 47

itself that relate to campaign contributions or expenditures. In that regard, it is unclear whether the Hazell plaintiffs' position is that "limitations" in section (9)(f) encompass only those provisions in Measure 47 that prohibit or "cap" contributions or expenditures, or if their position is that "limitations" refers to *all* of the substantive provisions in Measure 47, including the associated regulations such as reporting requirements.[11] That said, reasoning from that general premise, the Hazell plaintiffs contend that an individualized assessment of *each* of Measure 47's provisions relating to campaign contributions or expenditures is required and assert that, if *any* one of those provisions was constitutional on the date voters approved the measure, then Measure 47 in its entirety—including its limitations akin to those invalidated in *Vannatta I*—was, and is, operative.

Second, and more broadly, the Hazell plaintiffs seem to argue that the referent for "limitations on political campaign contributions or expenditures" is any and all restrictions, extant as of the effective date of Measure 47, that

---

[11] The Hazell plaintiffs' briefing in this respect is unclear. At certain points, the Hazell plaintiffs appear to take the position that "limitations" refers only to those provisions in Measure 47 that cap or prohibit campaign contributions and expenditures, and does not include Measure 47's reporting or disclosure requirements. For example, the Hazell plaintiffs posit that defendants' argument before the trial court, which endorsed the view that "limitations" in section (9)(f) does not encompass reporting or disclosure requirements, supports their position. And later, the Hazell plaintiffs distinguish the so-called "CC&E limits" in Measure 47 from the provisions that "change requirements for disclosure and reporting of campaign contributions and expenditures."

At other junctures, however, the Hazell plaintiffs appear to assert that "limitations" refers to all of the substantive provisions in Measure 47, including, for example, the measure's reporting requirements. For example, the Hazell plaintiffs identify 12 "non-numeric" (in their phrasing) provisions of Measure 47 relating to contributions and expenditures, which, they assert, are "not susceptible to challenge under *Vannatta*." Those provisions include, for example, Measure 47 at section (4)(b) (requiring candidates who contribute more than $5,000 to their own campaigns to report all subsequent personal contributions and to disclose the amount that they have spent on their campaign in campaign advertisements); section (8)(b) (requiring certain information about contributors to be included in a candidate's campaign contribution and expenditure reports); and section (8)(c) (requiring the Secretary of State to post all contributions and expenditure reports on the Internet within five business days of receiving the data). Additionally, the Hazell plaintiffs later contend that the term "limitations" in section (9)(f) is broad enough to encompass various existing reporting and disclosure requirements and, after identifying a few examples of such requirements, assert that "[s]urely the above examples are 'limitations on political campaign contributions or expenditures.'"

In an abundance of caution, our analysis addresses both alternatives.

relate to campaign contributions or expenditures. Such "limitations" would encompass, for example, statutes that prohibit candidates from using campaign contributions to defray personal expenses and rules that restrict judges from personally accepting campaign contributions. Reasoning from that premise, the Hazell plaintiffs assert that Measure 47 became immediately operative in its entirety, notwithstanding the qualifications of section (9)(f), because at least *some* such restrictions and regulations pertaining to contributions or expenditures were, and are, constitutional. *See, e.g., In re Fadeley*, 310 Or 548, 561-64, 802 P2d 31 (1990) (upholding, under Article I, section 8, judicial cannon prohibiting judges from personally soliciting campaign contributions).

Defendants, as noted, counter that, properly understood in context, the term "limitations on political campaign contributions or expenditures" in section (9)(f) connotes restrictions and prohibitions of the sort that the Oregon Supreme Court deemed unconstitutional in *Vannatta I.* As support for that understanding, defendants emphasize, particularly, the overarching context of Measure 47, including one of its prefatory findings that explicitly reference *Vannatta I*'s holding. Given that context and history, defendants assert that the voters reasonably understood that abrogation of *Vannatta I* was the *sine qua non* of Measure 47 becoming operative.

■ As amplified below, we agree with defendants. That is, unless or until Article I, section 8, is amended to permit compulsory limitations on campaign contributions and expenditures or the Oregon Supreme Court overrules critical aspects of *Vannatta I*, the substantive provisions in Measure 47 remain dormant.

■ To discern the meaning and operation of the phrase "limitations on political campaign contributions or expenditures" in section (9)(f), we look to the text, context, and pertinent history of that section. *Friends of Yamhill County*, 237 Or App at 166. For the purposes of construing a ballot measure, relevant history includes the ballot title and explanatory statement in the voters' pamphlet. *See Shilo Inn v. Multnomah County*, 333 Or 101, 129-30, 36 P3d 954 (2001), *adh'd to as modified on recons*, 334 Or 11, 45 P3d 107 (2002).

Measure 47 provides no definition for the terms "limitations" or "limit." However, *Webster's* defines "limitation" to include "the action of limiting" and "a restriction or restraint imposed from without." *Webster's* at 1312. "Limit," in turn, is pertinently defined to mean "something that bounds, restrains, or confines" or "a prescribed maximum or minimum amount, quantity, or number." *Id.* Thus, "limitations on political campaign contributions or expenditures" refers to those things that prescribe a maximum or minimum amount or otherwise restrict, restrain, or confine political campaign contributions or expenditures.[12]

In that respect, it bears emphasis that the statutory language is "limitations *on*" contributions or expenditures— and not "limitations *relating to*" contributions or expenditures. That is, the language of section (9)(f) connotes a direct and proximate restriction on the act of contributing or expending, and not collateral or attenuated requirements (*e.g.*, reporting requirements) relating to such activity. Other features of Measure 47 contextually confirm that understanding.[13]

A second feature of the statutory design also warrants emphasis: The enactment and operative effective clauses of section (9)(f) both have the same, single and undivided, referent: "this Act." Thus, Measure 47 cannot become

---

[12] Measure 47 does include definitions for contributions and expenditures, which are set out at section (2)(i) of that measure.

[13] *See, e.g.*, Measure 47, § 1(s) (observing that, "[w]hen the Measure 9 limits were in effect[,] * * * candidates were able to amass sufficient funds," and explaining that "the contribution limits in this Act will allow effective campaigns"; *id.* § 4(c) (describing as "limits" the contents of section 4(a), which establish the maximum dollar amounts a candidate may contribute to his or her own committee); *id.* § 4(c)(2) (describing as "limits" the contents of section (3)(d) to (g), which cap the amount of contributions that may be made by individuals and various committees).

In several instances, Measure 47's "limitations" are expressly distinguished from its reporting and disclosure requirements. *See, e.g.*, Measure 47 preamble (providing that the act's goals will be served "by *limiting* political campaign contributions and independent expenditures * * * and by increasing timely public *disclosure* of the sources of those contributions and expenditures" (emphases added)); *id.* § (1)(a) (stating that "[a]ll of the prohibitions, *limits, and reporting and disclosure requirements* of this Act are reasonable and necessary" (emphasis added)). The ballot title to Measure 47, which states that the measure "limits or prohibits contributions and expenditures; adds disclosure, new reporting requirements," echoes that same distinction. Official Voters' Pamphlet, General Election, Nov 7, 2006, 122 (capitalization omitted).

operative in piecemeal fashion. If the prerequisites of section (9)(f) are satisfied, all substantive provisions of Measure 47 are operative; if not, none are.

Given that design, the Hazell plaintiffs' contention that "limitations on political campaign contributions or expenditures" encompasses the universe of all provisions (whether in Measure 47 itself or otherwise) relating to contributions or expenditures is implausible, because it would render section (9)(f) gratuitous. That is so because, at the time that the voters approved Measure 47, it was indisputable that at least *some* sorts of long-established requirements pertaining to political campaign contributions or expenditures, including reporting requirements akin to those in Measure 47, *see, e.g.*, ORS 260.044, were, in fact, constitutional under the Oregon Constitution. *Cf. Vannatta I*, 324 Or 514. Accordingly, if the Hazell plaintiffs were correct, section (9)(f) would be meaningless, because its prerequisites would be illusory. We are constrained from attributing such an intent to the citizens of Oregon. *Cf. City of Eugene v. Nalven*, 152 Or App 720, 725-26, 955 P2d 263, *rev den*, 327 Or 431 (1998) (noting judicial obligation "to give full meaning and effect to all relevant statutory provisions").

Rather, the overarching context and history of Measure 47 demonstrates that the voters, in approving that initiative, understood the phrase "limitations on political campaign contributions or expenditures" in section (9)(f) to refer to limitations on campaign contributions or expenditures of the sort that had been deemed to be unconstitutional in *Vannatta I*.

Two aspects of that context and history are most significant. *First*, as noted, Measure 47 was formulated, presented, and approved against the backdrop of *Vannatta I*. *Second*, Measure 47 was presented to the voters with Measure 46. Measure 46, in turn, would have amended the Oregon Constitution to permit the enactment of laws that "limit or prohibit campaign contributions and expenditures," thus abrogating the Supreme Court's holding in *Vannatta I*.

Prefacing the substantive provisions of Measure 47 is an extensive "[f]indings" section, Measure 47, sections (1)(a) to (1)(y). Many of those prefatory "findings" describe

and decry the asserted pernicious effects of "uncapped" contributions. A few of those "findings" are exemplary:

"(a)   The democratic process has not functioned properly in Oregon, due to the lack of reasonable limits on political campaign contributions and expenditures, including expenditures made independently of candidates, on races for state and local public office. Oregon is one of only five states in the United States with no limits on political campaign contributions. All of the prohibitions, limits, and reporting, and disclosure requirements of this Act are reasonable and necessary to curb the undue influence of large contributions and expenditures.

"(b)   Because Oregon candidates are now forced to treat campaign fundraising as an 'arms race' to be won at all costs, they have become unduly beholden to large contributors and the special interests able to contribute large amounts for their campaigns.

"* * * * *

"(e)   Oregon candidates have become overly dependent upon large contributions from a very few donors.

"* * * * *

"(l)   Allowing unlimited individual contributions accords undue influence to wealthy individuals, regardless of their sources of wealth, who can use that influence to obtain access to public officeholders and benefits from government not available to others."

Of even more specific pertinence here is the "finding" expressed in section (1)(r):

"In 1994, voters in Oregon approved a statutory ballot measure, Measure 9, establishing *contribution limits similar to those in this Act,* by an affirmative vote of 72 percent. The Oregon Supreme Court in 1997 found that *those limits* were not permitted under the Oregon Constitution. *This Act shall take effect at a time when the Oregon Constitution does allow the limitations contained in this Act.*"

(Emphases added.) Thus, section (1)(r) expressly linked the operation of Measure 47 to constitutional authorization of the sort of limitations invalidated in *Vannatta I* in 1997 and, in doing so, reasonably informed the voters' understanding of section (9)(f).

What sorts of "limitations" were addressed in *Vannatta I*? We return briefly to the court's holding in that case and to its assessment of certain provisions of Ballot Measure 9 (1995).

In *Vannatta I*, the Oregon Supreme Court determined that political campaign contributions and expenditures are "both * * * forms of expression for the purposes of Article I, section 8." 324 Or at 524. In reaching that determination, the court accepted the state's concession that campaign expenditures are protected expression, but rejected the state's and an *amicus curiae*'s attempt to categorize contributions as nonexpressive. *Id.* at 520-22. According to the court, "the contribution, in and of itself, is *the contributor's expression of support for the candidate or cause*—an act of expression that is completed by the act of giving and that depends in no way on the ultimate use to which the contribution is put." *Id.* at 522 (emphasis in original). So viewed, the court reasoned, expenditures and contributions are "not opposite poles, but closely related activities" and thus, are both forms of protected expression for the purposes of Article I, section 8. *Id.* at 524.

Ultimately, the Oregon Supreme Court determined that provisions in Measure 9 that limited how much a person or political committee could contribute to a candidate, banned certain contributions made by candidates or campaign committees, and, with certain exceptions, banned corporations, professional corporations, nonprofits, and labor organizations from making campaign contributions and prohibited campaigns from accepting such contributions, were unconstitutional.[14] *Id.* at 537-41. The court upheld those provisions in Measure 9 that pertained to expenditures—but, in

---

[14] The Supreme Court, however, acknowledged that there are

"ways of supplying things of value to political campaigns or candidates that would have no expressive content or that would be in a form or from a source that the legislature otherwise would be entitled to regulate or prevent. To give but a few examples: A bribe may be an expression of support (with an anticipated *quid pro quo*), but it is not protected expression; a gift of money to a candidate from a corporation or union treasury may be expression but, if it is made in violation of neutral laws regulating the fiscal operation of corporations or unions, it is not protected; a donation of something of value to a friend who later, and unexpectedly, uses that thing of value to support the friend's political campaign is not expression."

doing so, emphasized that they were not compulsory, *id.* at 542-45, signaling that, if mandatory limitations were imposed on campaign expenditures, those limitations would likewise be unconstitutional. *See Meyer v. Bradbury*, 341 Or 288, 299, 142 P3d 1031 (2006) (citing *Vannatta I* and observing that, "[u]nder Oregon law, both campaign contributions and expenditures are forms of expression protected by [Article I, section 8], thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible"); *see also id.* at 293 n 4 (noting that, "[i]n [*Vannatta I*], this court held that Article I, section 8, prohibits laws restricting campaign expenditures and contributions").

Although the Oregon Supreme Court has subsequently clarified aspects of its holding in *Vannatta I, see Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 465, 222 P3d 1077 (2009), *cert den*, ___ US ___ , 130 S Ct 3313 (2010) (*Vannatta II*),[15] and *State v. Moyer*, 348 Or 220, 230, 230 P3d 7, *cert den*, ___ US ___ , 131 S Ct 326 (2010), it has not overruled that decision. *Vannatta I* remains controlling law.

---

*Vannatta I*, 324 Or at 522 n 10. The court further explained that neutral rules may restrict an entity's power to make a contribution in circumstances where that entity is "spending other people's money * * * without their consent":

> "[T]he right to spend money to encourage some candidate or cause does not necessarily extend to spending other people's money on a political message without their consent, whether that money comes from compulsory union fair share fees, a shareholder's equity, student activity fees, or dues paid to an integrated Bar. Similarly, the law may prohibit certain forms of contributions such as giving bribes."

*Id.* at 524.

[15] As relevant here, the *Vannatta II* court explained that, because *Vannatta I* had "assumed a symbiotic relationship between the making of contributions and the candidate's or campaign's ability to communicate a political message," for the purposes of that case, it did not "squarely decide * * * that, in every case, the delivery to a public official, a candidate, or a campaign of money or something of value also is constitutionally protected expression as a matter of law." 347 Or at 465. *See also Moyer*, 348 Or at 230 (quoting *Vannatta II* for the same principle). Additionally, the *Vannatta II* court concluded that "the court's statement in *Vannatta I* that campaign contributions were constitutionally protected forms of expression regardless of the 'ultimate use to which the contribution is put' " was "unnecessary to the court's holding" and "too broad." 347 Or at 465. Accordingly, the *Vannatta II* court withdrew that portion of the statement. *Id.*

Given the nature of the limitations addressed in *Vannatta I* and consistently with Measure 47, section (1)(r), voters considering Measure 47 reasonably understood the operative "limitations" in section (9)(f) to be prohibitions or restrictions akin to those deemed unconstitutional in *Vannatta I*.

As noted, Measure 47 was presented to the voters with Measure 46. The ballot title to Measure 46 stated:

"The Oregon Constitution currently bans laws that impose involuntary limits on, or otherwise prohibit, political campaign contributions or expenditures by any person or any entity. The measure amends the Oregon Constitution to allow laws, if they are enacted or amended through the ballot initiative process or by the Legislative Assembly by a three-fourths vote of both houses, that limit or prohibit campaign contributions and expenditures to influence the outcome of any election. The measure allows such limitations or prohibitions to apply to election contributions and expenditures of any type or description."

Consequently, voters understood that the limitations on campaign contributions or expenditures implicated by both Measures 46 and 47 were prohibitions and restrictions akin to those deemed unconstitutional in *Vannatta I*.

In sum, the substantive provisions of Measure 47 did not, and will not, become operative unless or until Article I, section 8, is amended to permit limitations of the sort deemed unconstitutional in *Vannatta I* or until the Oregon Supreme Court revisits *Vannatta I* and determines that such limitations are constitutional under Article I, section 8.

The trial court did not err in rejecting the Hazell and the Horton plaintiffs' and intervenors' motions for summary judgment and granting defendants' cross-motion for summary judgment.

Affirmed on appeal and cross-appeal.