DURHAM, J.,
concurring in part and dissenting in part.
I write separately because, despite some areas of agreement, I do not agree fully with the majority opinion. Additionally, according to the majority, the outcome of this case is that Measure 47 now will be “codified and held in abeyance pending an appropriate constitutional amendment or judicial decision that will render it operative.” 352 Or at 470. Of *471 those two options, a judicial decision addressing whether the Oregon Constitution precludes enactment of the limitations contained in Measure 47 seems more likely to occur. Because the majority dismisses the Hazell plaintiffs’ claims due to a shortcoming in their pleading — a problem that future litigants are likely to cure — it is appropriate to anticipate some of the questions that that later judicial decision might address.
I note at the outset that, for the reasons stated by the majority, I concur in the dismissal of the claims submitted by the Horton plaintiffs. Concerning the claims of the Hazell plaintiffs, the majority gives a case-specific reason for dismissing those claims: the complaint alleges only a nonspecific desire for a declaratory judgment or order requiring the Secretary of State and the Attorney General to administer and enforce Measure 47. Id. at 467. If this case concerned nothing more than a generalized request for a judicial directive compelling those state officials to comply with Oregon law, I might agree that the dispute may be too indefinite to justify declaratory relief. But, in my view, the plaintiffs have not drafted their complaint so narrowly. It serves the interest of no one for the majority to narrowly construe the material allegations of the complaint to avoid a decision here, and as a consequence, force other citizens to initiate additional expensive and time-consuming litigation to get an answer to the same issues raised here.
In that future litigation, as here, the most important question will be the one correctly stated by the Court of Appeals below: absent a constitutional amendment, will this court revisit Vannatta v. Keisling, 324 Or 514, 524, 931 P2d 770 (1997) (Vannatta I), and decide that at least some statutory limitations on campaign contributions and expenditures are constitutionally permissible? See Hazell v. Brown, 238 Or App 487, 512, 242 P3d 743 (2010). Without answering that question directly, I see several components of the issue that other parties necessarily must address in future proceedings.
Vannatta I began by asking whether political contributions and expenditures constituted protected forms of expression under Article I, section 8, ofthe Oregon Constitution.[1] *472 324 Or at 520. The court’s discussion initially suggested that it would give a nuanced answer to that question. For example, respecting political campaign expenditures, the court said:
“Expenditures by a candidate, an organization, a committee, or an individual, when designed to communicate to others the spender’s preferred political choice, is expression in essentially the same way that a candidate’s personal appeal for votes is expression.”
Id. (emphasis added).
The court also carefully couched its discussion of campaign contributions, stating:
“Under Oregon law, the sole remaining question is whether contributions to political campaigns and candidates also are a form of expression under Article I, section 8. For the reasons that follow, we conclude that many — probably most — are.[10]
«* * * * *
“We think that it takes little imagination to see how many political contributions constitute expression.
Id. at 522-23 (emphasis added).
*473 The court illustrated its point — that “many” contributions constitute expression — by indicating that individuals or groups have a right to pool their money to produce advertisements in print or electronic media, or to hire professionals to produce the ads. Id. at 523. Moreover, the court in the quoted footnote set out examples of political contributions that the legislature permissibly could regulate because they either would have no expressive content or would be from a source properly subject to some legislative controls, such as corporations or unions. Those passages indicated that the court’s answer would turn not on whether a political contribution merely facilitated speech by some speaker at some other time, but rather on whether the contribution itself amounted to expressive conduct or bore an immediate connection to political speech.
Those nuanced passages in the court’s opinion were accompanied by others that, by contrast, seemed to leave little or no room for legislative regulation. For example, the court said the following respecting a political contribution:
“In our view, a contribution is protected as an expression by the contributor, not because the contribution eventually may be used by a candidate to express a particular message. The money may never be used to promote a form of expression by the candidate; instead, it may (for example) be used to pay campaign staff or to meet other needs not tied to a particular message. However, the contribution, in and of itself, is the contributor’s expression of support for the candidate or cause — an act of expression that is completed by the act of giving and that depends in no way on the ultimate use to which the contribution is put.”
Id. at 522 (emphases in original).
Similarly, the court equated a citizen’s act of making a political contribution with a pure expression of opinion supporting a political candidate or cause:
“If, instead of giving a contribution, a citizen stood on a street corner and announced, T support candidate X,’ there would be no doubt that that message constituted an expression of general support for that candidate, as well as a more particular message: X deserves your vote.’ From the *474 perspective of the contributor, the contribution is the same kind of message as is the street corner announcement.”
Id. at 524.
The Vannatta I court in those passages appears to have implied a political communication from an act— delivering money to a campaign — whether or not any evidence supported that implication and despite evidence that the money never supported any political expression by either the donor or the recipient. Whether and to what extent the court’s conflicting statements about constitutional protections for contributions and expenditures reflected a binding holding of the court was further complicated by the fact that the Secretary of State conceded that campaign expenditures constituted free speech. Id. at 520, 542. That concession obviated any need for a court decision on the question. The court’s answer was, therefore, dictum.
Nonetheless, the court summarily swept away the difficulties regarding its analysis with one absolute and legally unnecessary conclusion:
“From the foregoing discussion, we conclude that both campaign contributions and expenditures are forms of expression for the purposes of Article I, section 8.”
Id. at 524 (footnote omitted). And that sentence from Vannatta I has been repeated by this court as if the more nuanced passages in Vannatta I did not exist. For example, Meyer v. Bradbury, 341 Or 288, 299, 142 P3d 1031 (2006), states:
“Under Oregon law, both campaign contributions and expenditures are forms of expression protected by that constitutional provision [Article I, section 8], thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible. See Vannatta v. Keisling, 324 Or 514, 524, 931 P2d 770 (1997) (so holding).”
The majority simply repeats again, with no separate analysis, the same absolute statement from Vannatta I and, later, Meyer, that shrouds rather than reveals this court’s actual reasoning in Vannatta I. Thus, according to the majority,
*475 “[0]ur holdings in Vannatta I and Meyer establish that, at the time that the voters considered Measure 47, campaign contributions and expenditures in Oregon were constitutionally protected forms of expression, and the legislature could not limit them.”
352 Or at 466.
The majority’s reliance here on the absolute declaration, quoted above, in Vannatta I is not correct. This court already has begun to reconsider and pull back from that absolute statement. In Vannatta v. Oregon Government Ethics Comm., 347 Or 449, 464, 222 P3d 1077 (2009) (Vannatta II), this court acknowledged the extreme nature of the statement in Vannatta I, but attempted to clarify and explain it, and, I submit, to alter it. Thus, Vannatta II declared that the statement in Vannatta I that a campaign contribution constituted free speech regardless of the ultimate use to which the contribution was put
“was unnecessary to the court’s holding. On further reflection, we conclude that that observation was too broad and must be withdrawn. Second, because Vannatta I assumed a symbiotic relationship between the making of contributions and the candidate’s or campaign’s ability to communicate a political message, this court did not squarely decide in Vannatta I that, in every case, the delivery to a public official, a candidate, or a campaign of money or something of value also is constitutionally protected expression as a matter of law.”
Vannatta II, 347 Or at 465. Vannatta II makes it clear that this court already has begun the process of reconsidering the absolute position voiced in Vannatta I and, as a consequence, to focus the free speech analysis under Article I, section 8, on whether a financial contribution in fact constitutes not merely a delivery of property but an act of protected expression by the donor.
Aside from the problems already noted, the court’s reasoning in Vannatta I for its absolute conclusion seems suspect. A campaign contribution, as noted, is a gift of property. A delivery of property may be accompanied by a donor’s protected expressions of political or personal support, but that constitutional protection pertains to the donor’s words, not the delivery of property by itself. It may *476 be possible to imagine circumstances in which the delivery of an article of property or money might constitute expression, perhaps akin to wearing a black armband. But an act— giving property to another — that does not constitute free speech in most conceivable contexts is not transformed into protected speech simply because the donee is a candidate or campaign and the donor is a political supporter. The answer cannot consist of categorically pronouncing, as the court did on occasion in Vannatta I, that contributing political money constitutes speech always or even most of the time. Rather, the answer depends on a careful examination of all the circumstances to determine whether and to what extent the conduct of giving or spending political money itself constitutes a protected expression.
Some campaign expenditures might readily qualify as protected free speech. The Vannatta I court’s example of individuals or neighbors banding together to publish political advertisements, either directly or through a retained professional ad producer, describe instances of spending behavior that has a logical nexus to political speech. The legislature may attach regulatory duties concerning, for example, the disclosures of sources and amounts of such expenditures, but it is doubtful that conventional laws simply could limit the number of supportive ads that an individual, a candidate, or a campaign could purchase without violating Article I, section 8.
However, the Vannatta I court’s hypothetical about the purchase of advertising does not support the broad conclusion that every monetary expenditure by a candidate or campaign constitutes free speech. For example, a campaign operative’s use of campaign funds to purchase ordinary consumer goods, without more, does not constitute free speech simply because the purchaser is a political campaign organization or because the expenditures will help campaign workers perform specific campaign tasks. The fact that every campaign worker, while spending campaign funds, may hope that their candidate wins an election does not turn every expenditure of campaign money into an act of free speech. The Vannatta I court did not assist in the task of determining how to identify the necessary nexus between a political expenditure and free speech by positing too-easy *477 hypotheticals that plainly sidestep the more difficult issues involved in analyzing free speech issues.[2]
Some academic commentators have begun to focus attention on the dearth of logical support for broad judicial pronouncements that, without any consideration of factual context, declare that the giving or spending of political money constitutes protected political speech. For example, Professor Deborah Heilman has stressed the importance of avoiding easy assumptions about whether contributing money to a candidate or campaign constitutes protected expressive conduct simply because the money might facilitate a political expression at some other place or time:
“While money surely facilitates speech, the facilitative function of money is not sufficient to show that restrictions on giving and spending money constitute restrictions on speech. Instead, I argue that while the fact that money helps people to speak is relevant to the issue of whether restrictions on giving and spending money restrict speech, the question is complex and involves consideration of other important factors. Money facilitates the exercise of many other rights as well. Sometimes spending money in connection with a right is treated as a part of the right, and sometimes it is not. When we note this fact, we see that a more comprehensive account is necessary to determine when the right to spend or give money should be treated as part of a First Amendment right. Spending money surely facilitates speech — about that the Buckley[3] Court *478 is right. But to move from the obviously true claim that money facilitates speech to the controversial claim that restrictions on spending money are restrictions on speech requires much more.”
Deborah Heilman, Money Talks but It Isn’t Speech, 95 Minn L Rev 953, 974 (2011). In my view, this court should be particularly sensitive to the need to reassess its past statements concerning the impact of the constitution on the giving and spending of political money because the exact scope of the legislature’s authority in that area turns on the answer.
This court has expressed its willingness to reconsider prior interpretations of the state constitution or statutes under the correct circumstances. Stranahan v. Fred Meyer, Inc., 331 Or 38, 54, 11 P3d 228 (2000), states:
“Consistent with the foregoing, we remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question. We will give particular attention to arguments that either present new information as to the meaning of the constitutional provision at issue or that demonstrate some failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question.”
This court further articulated the criteria that it will follow in deciding whether to alter or abandon a prior constitutional ruling in State v. Ciancanelli, 339 Or 282, 291, 121 P3d 613 (2005). Those criteria include whether the rule was not formulated by means of the appropriate paradigm or some suitable substitute, and whether the application of the correct paradigm would confirm that the challenged constitutional rule was incorrect. Id. The court also inquires whether, due to the passage of time and the precedential use of the rule, overturning the challenged rule would unduly cloud or complicate the law. Id.; see also State ex rel Huddleston v. Sawyer, 324 Or 597, 640-41, 932 P2d 1145 (1997) (Durham, J., concurring in part and dissenting in part) (discussing application of rule of stare decisis) (citing Safeway Stores v. State Bd. of Agriculture, 198 Or 43, 255 P2d 564 (1953)).
*479 The Hazell plaintiffs question the correctness of Vannatta I, but their effort here falls short of what is necessary under the cases just discussed to overcome the usual effect of stare decisis. If future litigation presents that question to this court, this court will consider that issue only if the plaintiffs preserve their arguments in the lower courts and present their challenge in the manner prescribed by this court’s precedents.
The majority declines to address even the brief challenge that the Hazell plaintiffs present here, relying on the assertion that those plaintiffs, due to the generality of their requested relief, have failed to identify an actual and substantial controversy between the parties. Setting aside the inadequacies of the Hazell plaintiffs’ challenge to Vannatta I, or their attempt merely to distinguish that case from the circumstances posed here, the majority’s answer is not correct.
The majority agrees that the Hazell plaintiffs have standing to assert their claims. 352 Or at 467. The Hazell plaintiffs’ contend in their complaint that the action of the Secretary of State has harmed them irreparably because they are now deprived of important information on the sources and amounts of money contributed to and used by candidates for public office and their campaigns. They point to the text of Measure 47, which would create reporting obligations for candidates, political committees, political parties, and individuals, and compel the Secretary of State to receive and publish to the public all reports of campaign contributions and expenditures in an accessible, computer-based format.
We are obligated, in construing the complaint, to accord the Hazell plaintiffs the benefit of every favorable inference that is available from their allegations. Applying that rule, it is a simple step to recognize that the Hazell plaintiffs seek the specific disclosure of political campaign information concerning contributions and expenditures to remedy what they assert is their irreparable injury. The Secretary of State was able to evade her specific obligation under Measure 47, section (8)(c), to supply that information to the Hazell plaintiffs by declaring Measure 47 dormant and inoperative.
*480 This court recently summarized the considerations that it addresses in deciding whether a controversy is justiciable:
‘“Justiciability is a vague standard but entails several definite considerations. A controversy is justiciable, as opposed to abstract, where there is an actual and substantial controversy between parties having adverse legal interests. The controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue. A justiciable controversy results in specific relief through a binding decree as opposed to an advisory opinion which is binding on no one. The court cannot exercise jurisdiction over a nonjusticiable controversy because in the absence of constitutional authority, the court cannot render advisory opinions.’”
Pendleton School Dist. v. State of Oregon, 345 Or 596, 604, 200 P3d 133 (2009) (quoting Brown v. Oregon State Bar, 293 Or 446, 449, 648 P2d 1289 (1982)) (citations omitted in original).
Applying the criteria described in Pendleton School Dist. and Brown, it is clear that the Hazell plaintiffs have alleged a justiciable controversy. The Hazell plaintiffs assert, among other things, that defendants, the Secretary of State and the Attorney General erred in declaring that Measure 47 was not in effect. They also allege that, due to defendants’ conduct, they are now irreparably injured by their inability to receive the campaign reports and information that Measure 47 obligates defendants to receive and publish. If the court were to declare Measure 47 legally effective, the Hazell plaintiffs would receive immediate relief from their claimed irreparable injury in that Measure 47 would obligate the Secretary of State to provide the campaign information that the Hazell plaintiffs seek. Thus, a declaration of law in the Hazell plaintiffs’ favor would resolve a dispute concerning present, not hypothetical, facts, and would result in specific relief that would bind the Hazell plaintiffs and defendants. A declaration of law in the Hazell plaintiffs’ favor would not produce a mere advisory opinion that would bind no one.
I conclude, contrary to the majority, that the Hazell plaintiffs have pleaded a justiciable controversy that should result in a declaration of law about whether Measure 47 *481 is legally effective. The court should decide the question of whether and to what extent the people, exercising their power of initiative, may place regulatory limits on campaign contributions and expenditures. Because this court authored Vannatta I, only this court can decide whether that decision misinterpreted the effect of Article I, section 8, on legislative authority to enact campaign finance regulations and, thus, whether the limitations in Measure 47 on campaign contributions and expenditures are consistent with the Oregon Constitution.
For the reasons expressed above, I concur in the dismissal of the complaint of the Horton plaintiffs. I dissent from the majority’s dismissal of the complaint of the Hazell plaintiffs due to an asserted lack of a justiciable controversy between the parties.

 Article I, section 8, of the Oregon Constitution provides:
*472 “No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right.”

“10 We qualify our statement with the limiting word, ‘many,’ because there doubtless are ways of supplying things of value to political campaigns or candidates that would have no expressive content or that would be in a form or from a source that the legislature otherwise would be entitled to regulate or prevent. To give but a few examples: A bribe may be an expression of support (with an anticipated quid pro quo), but it is not protected expression; a gift of money to a candidate from a corporation or union treasury may be expression but, if it is made in violation of neutral laws regulating the fiscal operation of corporations or unions, it is not protected; a donation of something of value to a friend who later, and unexpectedly, uses that thing of value to support the friend’s political campaign is not expression.”

 This court must engage in a separate analysis of the distinct acts of contributing money to a campaign and spending money that a candidate or campaign has received from donors. Making a contribution to a candidate or campaign is conduct, and the court’s analytical focus is whether that conduct amounts to constitutionally protected expression by the donor when the donation occurs. The answer does not depend on whether the recipient, i.e., the candidate or campaign, will benefit generally from the donation or use the money later to engage in political speech.
The expenditure of money by a candidate or campaign similarly is conduct, and the court’s analytical focus is whether the conduct constitutes expression. Some expenditures will have an obvious nexus to political advocacy, such as purchasing advertising space in a newspaper or air time from a radio or television station for a political spot. Any limitation on those expenditures clearly would stifle protected speech, but the same is not true for other campaign expenditures that have little or no tie to expression on any subject. The fact that an expenditure originates with a campaign does not demonstrate automatically that Article I, section 8, protects it as free expression. Vannatta I failed to engage in the careful analysis of those separate kinds of actions that Article I, section 8, demands.

3 Buckley v. Valeo, 424 US 1, 16, 96 S Ct 612, 46 L Ed 3d 659 (1976).