Filed: October 4, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

BRYN HAZELL,
FRANCIS NELSON, TOM CIVILETTI, DAVID DELK,
GARY DUELL, JOAN HORTON, and KEN LEWIS,

Plaintiffs-Appellants
Cross-Respondents,
Petitioners on Review,

v.

KATE BROWN,
Secretary of State of the State of Oregon;
and JOHN R. KROGER,
Attorney General of the State of Oregon,

Defendants-Respondents
Cross-Respondents,
Respondents on Review,

and

CENTER TO PROTECT FREE SPEECH, INC.,
an Oregon nonprofit corporation;
and FRED VANNATTA,

Intervenors-Respondents
Cross-Appellants,
Respondents on Review.

(CC 06C22473; CA A137397; SC S059245 (Control), S059246)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 9, 2012.

Daniel W. Meek, Portland, argued the cause and filed the brief for petitioners on review Bryn Hazell, Francis Nelson, Tom Civiletti, David Delk, and Gary Duell. With him on the brief was Linda K. Williams.

Linda K. Williams, Portland, argued the cause and filed the brief for petitioners on review Joan Horton and Ken Lewis. With her on the briefs was Daniel W. Meek.

John DiLorenzo, Davis Wright Tremaine LLP, Portland argued the cause for respondents on review Center to Protect Free Speech and Fred Vannatta. With him on the brief were Gregory A. Chaimov, Aaron K. Stuckey, and Paul J. Southwick.

Michael A. Casper, Deputy Solicitor General, Salem, argued the cause for respondents on review State of Oregon and John R. Kroger, Attorney General. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

P. K. Runkles-Pearson, Stoel Rives LLP, Portland, filed a brief on behalf of *amicus curiae* ACLU Foundation of Oregon.

DE MUNIZ, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

Durham, J., concurred in part and dissented in part and filed an opinion.

*Appeal from Marion County Circuit Court, Mary Mertens James, Judge. 238 Or App 487, 242 P3d 743 (2010).

DE MUNIZ, J.

This case requires us to examine the operative text of a voter-approved ballot measure that purported to depend for its efficacy upon the passage of a companion measure that voters rejected. The trial court concluded that the text at issue was severable from the ballot measure and ruled that the remaining provisions of the measure were, according to the plain text of the measure itself, dormant. The Court of Appeals affirmed that judgment. *Hazell v. Brown*, 238 Or App 487, 242 P3d 743 (2010). For the reasons set out in this opinion, we also affirm the trial court's judgment and the decision rendered by the Court of Appeals.

## FACTS AND PROCEDURAL BACKGROUND

In 2006, two ballot measures were placed before Oregon voters at the polls. One -- Measure 46 (2006) -- sought to amend the Oregon Constitution to permit the enactment of laws prohibiting or limiting electoral campaign "contributions and expenditures, of any type or description." The other -- Measure 47 (2006) -- sought to create new campaign finance statutes that would, essentially, statutorily implement the constitutional changes proposed in Measure 46. Voters, however, rejected Measure 46 while approving Measure 47. Among other things, Measure 47 contained a clause at section 9(f) that provided:

> "If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations."

Relying on that provision, the Secretary of State's office took the position

1

that, in light of Measure 46's defeat at the polls, Measure 47 was, by its own terms, unenforceable. It stated:

> "The plain text of Section (9)(f) requires that the entire measure is to be codified as part of the statutory law of Oregon. That text also specifies that 'this Act' -- referring singularly to the entire measure -- will be ineffective until such time as 'the Oregon Constitution is found to allow, or is amended to allow,' limitations on campaign contributions and expenditures. Because Measure 46 was not approved by the people, the conditions required by Section (9)(f) for the rest of measure 47 to become operative will not have been fulfilled on December 7, 2006. Accordingly, the effect of Section (9)(f) is that no part of the measure presently is enforceable. According to the plain, natural, and ordinary meaning of the words of Section (9)(f), all of Measure 47 will remain dormant until such time as 'the Oregon Constitution is found to allow, or is amended to allow,' limitations on campaign contributions and expenditures."[1]

Several of the measure's chief petitioners, together with other Oregon voters, responded to that determination by bringing an action against both the Secretary of State and the Attorney General (collectively, the state), seeking declaratory and injunctive relief to compel enforcement of Measure 47. In response, the Center to Protect Free Speech, Inc., and its president, Fred Vannatta, intervened to oppose that action, asserting that section 9(f) of Measure 47 violated Article I, section 21, of the Oregon Constitution, rendering the entire measure void. On cross-motions for summary judgment filed by all the parties, the trial court ruled in the state's favor, concluding that Measure 47 was presently inoperative.

---

[1] Measure 47 (2006) is currently codified as a "legislative note" at ORS chapter 259. Among other purposes, such notes are used to signify, as in this case, a special date on which a provision will take effect.

2

In a letter opinion to the parties, the trial court found the text and context of section 9(f) to be unambiguous as to the meaning and effect of Measure 47:

> "The text of section (9)(f) describes a condition, then mandates the consequences if that condition obtains. The condition triggering section (9)(f) is that 'on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contribution and expenditures.' The mandated consequence if that condition obtains is that the 'Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such limitations.' As held above, the triggering circumstances unambiguously existed and were not changed by Measure 46, which did not pass. The unambiguous consequence is that Measure 47, in its entirety, presently is not operative."

The trial court reached similar conclusions regarding the constitutionality of section 9(f), rejecting the argument that the section violated Article IV, section 1(4)(d), because it altered the effective date of Measure 47 rather than its operative effect. The trial court wrote:

> "That contention is answered completely by *State v. Hecker*, 109 Or 520 (1923). *Hecker* makes clear that section (9)(f)'s use of the term 'shall become effective' must be construed to mean 'shall become *operationally* effective.' So construed, as in *Hecker*, section (9)(f) conflicts with no constitutional requirements as to the effective date of legislation passed by initiative.
>
> "Nor is the indeterminate nature of the contingency fatal to the provision's effect. In *Hecker*, the challenged statute was to become operative whenever constitutionally authorized, without any specification of an election at which such a proposal might be considered. * * * Nevertheless, the Oregon Supreme Court upheld the contingency. Section (9)(f) similarly may be sustained under that directly controlling authority, at least with respect to the operative effect being contingent on amendment of the Oregon Constitution."

(Emphasis in original.)

As to intervenors' argument that section 9(f) violated Article I, section 21,

3

the trial court first held that

> "the contingency rendering Measure 47 operative if it is authorized by constitutional amendment is exactly the same contingency upheld in *Hecker*. Section (9)(f)'s direction that Measure 47 shall become operative upon amendment of the constitution to allow [campaign contribution and expenditure] limits is permissible."

The trial court, however, declined to directly address the second contingency in section 9(f), *i.e.*, whether Measure 47 could properly become operative on a future judicial finding. It concluded, instead, that, even if the measure's operative effect could not constitutionally depend on such an occurrence, ORS 174.040 permitted it to sever the offending portion and to give effect to the remainder of section 9(f).

Plaintiffs appealed, and the Court of Appeals affirmed the trial court. In doing so, the Court of Appeals similarly concluded that Measure 47 was inoperative:

> "In sum, the substantive provisions of Measure 47 did not, and will not, become operative unless or until Article I, section 8, is amended to permit limitations of the sort deemed unconstitutional in *Vannatta I* or until the Oregon Supreme Court revisits *Vannatta I* and determines that such limitations are constitutional under Article I, section 8."

*Hazell*, 238 Or App at 512. We subsequently allowed plaintiffs' petitions for review. For the reasons set out below, we affirm the Court of Appeals decision and the trial court's judgment.

ADDITIONAL BACKGROUND -- MEASURE 47

The history of this case goes back nearly 18 years to 1994, when Oregon voters enacted Ballot Measure 9 (1994), a citizen initiative that, among other things, set mandatory limits on monetary contributions to state political campaigns. In 1997, this court held in *Vannatta v. Keisling*, 324 Or 514, 931 P2d 770 (1997) (*Vannatta I*), that

4

such limits -- together with campaign expenditure limits -- violated the free expression rights guaranteed by Article I, section 8, of the Oregon Constitution. Later, specifically citing *Vannatta I* for that proposition in 2006, this court stated:

> "Since the inception of the Oregon Constitution, Article I, section 8, strictly has prohibited any legislation 'restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]' Under Oregon law, both campaign contributions and expenditures are forms of expression protected by that constitutional provision, thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible. *See Vannatta v. Keisling*, 324 Or 514, 524, 931 P2d 770 (1997) (so holding)."

*Meyer v. Bradbury*, 341 Or 288, 299, 142 P3d 1031 (2006) (brackets in original).

At the 2006 election that followed that decision, Oregon voters were subsequently invited to amend Oregon's campaign finance laws by approving citizen-initiated Measure 46 and Measure 47. If passed, Measure 46 would have amended the Oregon Constitution to expressly allow laws limiting or prohibiting election contributions and expenditures, as long as such laws were either the product of citizen initiatives or otherwise adopted by three-quarters of both legislative houses.

While Measure 46 would have amended the Oregon Constitution, Measure 47, if adopted, was slated to amend the Oregon statutes to address the lack of "reasonable limits on political campaign contribution and expenditures" contained in the current statutes. As part of an extensive array of findings, section 1(a) of Measure 47 linked virtually all of the provisions of the measure to the ultimate goal of reining in the undue influence of campaign contributions and expenditures that, from its drafter's perspective, were too large:

5

"The democratic process has not functioned properly in Oregon, due to the lack of reasonable limits on political campaign contributions and expenditures, including expenditures made independently of candidates, on races for state and local public office. Oregon is one of only five states in the United States with no limits on political campaign contributions. *All of the prohibitions, limits, and reporting and disclosure requirements of this Act are reasonable and necessary to curb the undue influence of large contributions and expenditures.*"

(Emphasis added.)

Measure 47 went on to set out a new chapter of Oregon laws devoted solely to creating and implementing a variety of limitations on campaign contributions and expenditures. For example, Measure 47 limited amounts that could be contributed to candidates, political committees, or political parties. It limited contributions that candidates could make to their own campaigns, and prohibited them from making loans to their own campaign committees. It banned, with certain exceptions, corporations, labor unions, and certain individuals from making campaign contributions altogether, and prohibited campaigns and political parties from accepting contributions that were impermissible under the measure's provisions.

Measure 47 also imposed mandatory limits on political expenditures by limiting the amount that persons could spend to directly communicate support for, or opposition to, a political candidate or party. In addition, the measure prohibited -- with some exceptions -- similar expenditures by corporations, labor unions, and certain individuals. Measure 47 further limited the amount that candidates and political committees could spend to oppose or support a candidate or party.

In addition to those contribution and expenditure provisions, Measure 47

6

set out various disclosure and reporting requirements. It delineated how the state was to administer, track, and publish information concerning candidate contributions and expenditures, and it imposed penalties for violating the measure's various restrictions.

The drafters of Measure 47, however, were clearly cognizant of the constitutional barriers that could hinder implementation of the measure if it were enacted without substantive changes to either the Oregon Constitution or this court's prior interpretation of that document's free expression provision. Consequently, additional findings set out as section 1(r) of Measure 47 explicitly linked the time at which the measure would "take effect" to a time -- unspecified -- that the Oregon Constitution would allow the campaign finance limitations proffered by the measure. Section 1(r) provided:

> "In 1994, voters in Oregon approved a statutory ballot measure, Measure 9, establishing contribution limits similar to those in this Act, by an affirmative vote of 72 percent. The Oregon Supreme Court in 1997 found that those limits were not permitted under the Oregon Constitution. *This Act shall take effect at a time when the Oregon Constitution does allow the limitations contained in this Act*."

(Emphasis added.)

As noted, at the 2006 general election, Oregon voters rejected Measure 46 but passed Measure 47. This action followed.

DISCUSSION

For the reader's convenience, we again set out section 9(f) of Measure 47:

> "If, on the effective date of this Act, the Oregon Constitution does not allow limitations on political campaign contributions or expenditures, this Act shall nevertheless be codified and shall become effective at the time that the Oregon Constitution is found to allow, or is amended to allow, such

7

limitations."

In seeking declaratory and injunctive relief here, plaintiffs consist of two groups -- Hazell, Nelson, Civiletti, Delk, and Duell (Hazell plaintiffs), and Horton and Lewis (Horton plaintiffs). Each group presents different arguments concerning the validity and overall effects of section 9(f) on the other provisions of Measure 47.

We begin with the Hazell plaintiffs, who take the position that the precipitating condition set out in section 9(f) has yet to occur. Section 1(r) of Measure 47, they point out, expressly provides that the measure "will take effect at a time when the Oregon Constitution does allow the limitations *contained in this Act*." (Emphasis added.) They argue that, in the context of that provision, the reference to "limitations" in section 9(f) should be narrowly construed to mean only those limitations set out in Measure 47 -- not the limitations previously held unconstitutional in *Vannatta I*. Because Measure 47 became effective in December 2006, the Hazell plaintiffs continue, determining whether the condition anticipated by section 9(f) has been met or not requires this court to first determine the constitutionality of each provision of Measure 47, a process that, in turn, would implicitly require us to revisit *Vannatta I*.

Alternatively, they assert that a literal, less context-driven interpretation of section 9(f) yields the same result. As they argued below, they again contend that, as of the effective date of Measure 47, the Oregon Constitution did, in fact, allow some finance-related campaign limitations. According to the Hazell plaintiffs, those limitations presently take the form of various registration, reporting, and identification requirements for contributors, as well as the requirement that contributions be used only for bona fide

8

campaign expenses or to defray the costs of a recipient's duties as a public office holder. Given the existence of those restrictions, the Hazell plaintiffs argue, the condition set out in section 9(f) has yet to arise, a circumstance that again places the onus of determining the substantive constitutionality of all the provisions of Measure 47 with this court.

The problem with those arguments, however, is that they assume that we must interpret section 9(f) in isolation, where the controlling context for our analysis is Measure 47 and little else. That assumption, however, ignores the nature of legislative power and the judicial decisions that arguably gave rise to the enactment of Measure 47.

We have recognized that the legislative power is a unitary authority that rests with two lawmaking bodies, the legislature and the people. *Meyer v. Bradbury*, 341 Or 299-300. The exercise of that power is always "coequal and co-ordinate," regardless of which of the two entities wields it. *Id*. at 300. For that reason, we apply a similar method of analysis to statutes enacted by voter-initiated measures as we do to statutes enacted by the legislature, with the goal of discerning the intent of the voters who passed those initiatives into law. *State v. Guzek*, 322 Or 245, 265, 906 P2d 272 (1995).

We begin with the statutory text. *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993). As the Court of Appeals observed, the pertinent "statutory language is 'limitations on' contributions or expenditures -- and not 'limitations *relating to*' contributions or expenditures." *Hazell*, 238 Or App at 507 (emphasis in original). In other words, the text of section 9(f) implies that that provision is intended to refer to direct limitations on the act of contributing or expending campaign funds, not on collateral requirements such as reporting and timely disclosure regarding

9

the receipt or expenditure of campaign funds.

The Court of Appeals also noted that the "enacting and operative effective clauses of section 9(f) both have the same single and undivided referent: 'This Act.'" *Id.* Like the Court of Appeals, we view the use of the phrase "This Act" as evidence that the voters intended and understood that, if and when Measure 47 became operative, it would do so as a whole piece of legislation, not in some piecemeal fashion.

A well-established part of our interpretive methodology requires that we presume that laws are enacted in light of the judicial decisions that preceded and bear directly on them. *Weber and Weber*, 337 Or 55, 67-68, 91 P3d 706 (2004). Here, our holdings in *Vannatta I* and *Meyer* establish that, at the time that the voters considered Measure 47, campaign contributions and expenditures in Oregon were constitutionally protected forms of expression, and the legislature could not limit them. The plethora of mandatory contribution and expenditure limitations set out in Measure 47 contrast sharply with those holdings, leading us to conclude that *Vannatta I* and *Meyer* clearly have a direct bearing on the measure. In that context, the limitations cited in section 9(f) are most logically viewed broadly as the same kind of limitations struck down in *Vannatta I* and *Meyer*, namely, "legislatively imposed limitations on individual political campaign contributions and expenditures." *Meyer*, 341 Or at 299.

That reading of section 9(f) is further reinforced by the findings that make up a substantial part of Measure 47. As we already have noted, the findings in section 1(r) acknowledge the campaign finance limitations passed by voters in 1994, the similarity of those limitations to the restrictions of Measure 47, and the fact that this court

10

subsequently held that the Oregon Constitution did not permit such limitations. At the same time, the findings in section 1(a) suggest that, now, the lack of reasonable limits on campaign finances have interfered with the proper function of Oregon's democratic processes by permitting undue influence from large campaign contributions and expenditures; as a result "[a]ll of the prohibitions, limits, and reporting and disclosure requirements" of Measure 47 are reasonably necessary to remedy that situation.

Those findings, however, depict a problem rooted in the broad constitutional prohibition articulated in *Vannatta I* and *Meyer*. The substantive provisions of Measure 47 are, according to the measure's own terms, aimed at correcting problems that have arisen, at least in part, because legislatively imposed limitations on campaign contributions and expenditures are subject to the constitutional bar articulated in those decisions. However, if Measure 47 is to have any operative effect at all, that bar must, at some point, be removed. Consequently, the "limitations on political campaign contributions or expenditures " invoked in section 9(f) are best understood as the same kind of limitations that were constitutionally invalidated in *Vannatta I* and that must, in turn, be permitted by the Oregon Constitution if Measure 47 is to become operational.

Based on the foregoing, and because the Oregon Constitution did not allow such limitations on the effective date of Measure 47, we conclude that the condition provided by 9(f) for holding Measure 47 in operational abeyance has, indeed, been met here.

The Hazell plaintiffs contend, however, that even if that condition has been triggered, its effect is simply to suspend the limitations contained in Measure 47 pending

11

litigation to determine their validity. They assert that these proceedings are, in fact, that litigation, making it incumbent upon this court to now engage in a provision-by-provision determination of the constitutionality of Measure 47.

We disagree. The only issue properly before this court is whether the Secretary of State and the Attorney General correctly relied on section 9(f) to determine that Measure 47 is essentially a dormant statute. In that regard, plaintiffs have standing under ORS 246.910 to challenge the Secretary of State's determination that Measure 47 is dormant as an operational matter. *See Ellis v. Roberts*, 302 Or 6, 11, 725 P2d 886 (1986) ("ORS 246.910(1) requires only that a person be 'adversely affected' before he can bring an action challenging an election ruling of the Secretary of State. In effect, this means that any registered voter -- and probably others as well -- can file an action.").

But, as noted above, plaintiffs have also invited us to rule on the constitutionality of individual provisions of Measure 47. They neglect, however, to seek any specific relief connected to the application or nonapplication of the individual provisions in question. Requesting only that we now require the Secretary of State and the Attorney General "administer and enforce all of the provisions of Measure 47" is not enough, under the circumstances of this case, to allege a justiciable controversy under the declaratory judgment act, as to the individual provisions of Measure 47. *See Eacret v. Holmes*, 215 Or 121, 333 P2d 741 (1958) (complaint fails to state a justiciable controversy under declaratory judgment act where plaintiffs requested no relief except that court declare what the law is). Because plaintiffs have failed to raise an actual controversy relating to the individual provisions of Measure 47, any attempted

12

reexamination of this court's decision in *Vannatta I* as it relates to individual provisions of Measure 47 would be only advisory -- a function this court cannot undertake. *See Gortmaker v. Seaton*, 252 Or 440, 444, 450 P2d 547 (1969) ("In this state, however, we have strong precedent against advisory opinions. Mere difference of opinion as to the constitutionality of an act does not afford ground for invoking a judicial declaration having the effect of adjudication."); *see also TVKO v. Howland*, 335 Or 527, 534, 73 P3d 905 (2003) (courts cannot issue declaratory judgments in a vacuum; they must resolve an actual or justiciable controversy). As a result, both the trial court and the Court of Appeals wisely refrained from addressing those questions, as will we. We now turn to the Horton plaintiffs' contentions.

The Horton plaintiffs take a different approach to section 9(f) than did the Hazell plaintiffs. According to the Horton plaintiffs, section 9(f) must be severed in its entirety, because it allows Measure 47 to become operative without providing adequate notice of that fact to Oregon citizens as required by due process principles and the constitutional provisions related to the effective date of newly enacted measures. They argue that the only legitimate contingencies recognized in Oregon case law have been actual anticipated events -- like election outcomes -- that are germane to the substance of the suspended law. Here, they contend, the contingency set out in section 9(f) would allow the otherwise dormant law to become operative by inadvertence, surprise, or on an arbitrary event completely decoupled from any expression of assent by the voters or their representatives. The tenets around which a representative democracy are built, the Horton plaintiffs assert, do not include "implied consent to be governed in an arbitrary

13

manner where laws can spring into operation upon later nonpublic contingencies entirely divorced from the express or implied will of the people."

That argument is unpersuasive, given our interpretation of Measure 47 as set out in this opinion. We have concluded that Measure 47 will become effective as a whole or it will not become effective. We have explained that Oregon voters intended Measure 47 to remain inoperative absent a constitutional amendment like Measure 46, or a controlling judicial construction of Article I, section 8, that effectively reverses *Vanatta I*. Measures 47 will not, therefore, spring to life based on events that are arbitrary, difficult to describe, or unpredictable. If either of the contingencies noted above occurs, Measure 47 will become effective according to the expressed will of the voters and under terms that they intended. A change of that magnitude will not take place in a closet.

Like plaintiffs in this matter, intervenors also take issue with section 9(f), albeit for different reasons. According to intervenors, when the drafters of Measure 47 provided that the act "shall nevertheless be codified and shall become effective" when the required contingency is met, they used the word "effective" when they should have used the word "operative." Intervenors contend that that flaw is fatal to the entire measure. They note that, under Article IV, section 1(4)(d), initiative or referendum measures become "effective" 30 days after those measures are enacted by a majority of voters. Intervenors appear to argue that, as written, section 9(f) does not actually forestall the *operation* of Measure 47 but rather resets the *effective date*, violating the constitutional edict in Article I, section 21, that no laws shall "be passed the taking effect of which shall be made to depend on any authority, except as provided in this Constitution." They go on

14

to assert that, as a result, all of Measure 47 is invalid and must be struck down.

Given that this court already has construed terms such as "effective" or "shall take effect" as being synonymous and interchangeable with the word "operative," Oregon law presents an alternative construction to the one proffered by intervenors in this case. In *State v. Hecker*, 109 Or 520, 221 P 808 (1923), this court examined the constitutionality of a statutory contingency provision not unlike the one at issue here. The contingency at issue in *Hecker* provided:

> "This act *shall take effect* as soon as and whenever the constitutional
> provisions of section 36 of article 1 of the Constitution of the state of
> Oregon relating to the death penalty and any amendment or amendments
> thereto, will permit."

*Id*. at 539 (emphasis added). The court concluded that, as part of that contingency provision, the phrase "shall take effect" was not used in the same sense as the mandate from the Oregon Constitution that legislative acts lacking an emergency clause "shall take effect" 90 days after the end of the legislative session. *See* Or Const, Art IV, § 28, (so stating). Instead, the court reasoned that, as used within the contingency provision, the phrase was meant to postpone the active operation of the statute until it could operate "contemporaneously with but not before the amendment of the Constitution." *Id.* at 547.

Intervenors acknowledge our holding in *Hecker*, but argue that, since then, the vocabulary of lawmaking has become precise to the point that we should assume that lawmakers now carefully differentiate between the terms "effective" and "operative" and never mean the one when they use the other. Today, the art of drafting statutes may, as intervenors urge, be more sophisticated than in 1920. However, that fact does not

15

circumvent the overarching duty of this court to "avoid any strained construction that would defeat the will of the people, clearly expressed, in the method provided by the Constitution." *State v. Tollerson*, 142 Or 192, 198, 16 P2d 625 (1932). Our decision in *Hecker* is not only instructive here, it also never has been modified (much less overruled) by this court, or countermanded by legislative action. Consequently, we conclude that section 9(f), properly read, requires Measure 47 to be codified and held in abeyance pending an appropriate constitutional amendment or judicial decision that will render it operative. Neither the trial court nor the Court of Appeals erred in so holding.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**DURHAM, J.,** concurring in part and dissenting in part.

I write separately because, despite some areas of agreement, I do not agree fully with the majority opinion. Additionally, according to the majority, the outcome of this case is that Measure 47 now will be "codified and held in abeyance pending an appropriate constitutional amendment or judicial decision that will render it operative." 352 Or at ___ (Oct 4, 2012) (slip op at 15). Of those two options, a judicial decision addressing whether the Oregon Constitution precludes enactment of the limitations contained in Measure 47 seems more likely to occur. Because the majority dismisses the Hazell plaintiffs' claims due to a shortcoming in their pleading -- a problem that future litigants are likely to cure -- it is appropriate to anticipate some of the questions that that later judicial decision might address.

I note at the outset that, for the reasons stated by the majority, I concur in the dismissal of the claims submitted by the Horton plaintiffs. Concerning the claims of the Hazell plaintiffs, the majority gives a case-specific reason for dismissing those claims: the complaint alleges only a nonspecific desire for a declaratory judgment or order requiring the Secretary of State and the Attorney General to administer and enforce Measure 47. *Id.* at ___ (slip op at 12). If this case concerned nothing more than a generalized request for a judicial directive compelling those state officials to comply with Oregon law, I might agree that the dispute may be too indefinite to justify declaratory relief. But, in my view, the plaintiffs have not drafted their complaint so narrowly. It serves the interest of no one for the majority to narrowly construe the material allegations of the complaint to avoid a decision here, and as a consequence, force other citizens to

1

initiate additional expensive and time-consuming litigation to get an answer to the same issues raised here.

In that future litigation, as here, the most important question will be the one correctly stated by the Court of Appeals below:  absent a constitutional amendment, will this court revisit *Vannatta v. Keisling*, 324 Or 514, 524, 931 P2d 770 (1997) (*Vannatta I*) and decide that at least some statutory limitations on campaign contributions and expenditures are constitutionally permissible?  *See Hazell v. Brown*, 238 Or App 487, 512, 242 P3d 743 (2010).  Without answering that question directly, I see several components of the issue that other parties necessarily must address in future proceedings.

*Vannatta I* began by asking whether political contributions and expenditures constituted protected forms of expression under Article I, section 8, of the Oregon Constitution.[1]  324 Or at 520.  The court's discussion initially suggested that it would give a nuanced answer to that question.  For example, respecting political campaign expenditures, the court said:

> "Expenditures by a candidate, an organization, a committee, or an individual, *when designed to communicate to others the spender's preferred political choice*, is expression in essentially the same way that a candidate's personal appeal for votes is expression."

*Id.* (emphasis added).

---

[1]     Article I, section 8, of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The court also carefully couched its discussion of campaign contributions, stating:

> "Under Oregon law, the sole remaining question is whether contributions to political campaigns and candidates also are a form of expression under Article I, section 8. For the reasons that follow, we conclude that *many -- probably most -- are.*[10]

> "* * * * *

> "We think that it takes little imagination to see how *many* political contributions constitute expression.

_____

"[10] We qualify our statement with the limiting word, 'many,' because there doubtless are ways of supplying things of value to political campaigns or candidates *that would have no expressive content or that would be in a form or from a source that the legislature otherwise would be entitled to regulate or prevent.* To give but a few examples: A bribe may be an expression of support (with an anticipated *quid pro quo*), but it is not protected expression; a gift of money to a candidate from a corporation or union treasury may be expression but, if it is made in violation of neutral laws regulating the fiscal operation of corporations or unions, it is not protected; a donation of something of value to a friend who later, and unexpectedly, uses that thing of value to support the friend's political campaign is not expression."

*Id.* at 522-23 (emphasis added).

The court illustrated its point -- that "many" contributions constitute expression -- by indicating that individuals or groups have a right to pool their money to produce advertisements in print or electronic media, or to hire professionals to produce the ads. *Id.* at 523. Moreover, the court in the quoted footnote set out examples of political contributions that the legislature permissibly could regulate because they *either* would have no expressive content *or* would be from a source properly subject to some

3

legislative controls, such as corporations or unions. Those passages indicated that the court's answer would turn not on whether a political contribution merely facilitated speech by some speaker at some other time, but rather on whether the contribution itself amounted to expressive conduct or bore an immediate connection to political speech.

Those nuanced passages in the court's opinion were accompanied by others that, by contrast, seemed to leave little or no room for legislative regulation. For example, the court said the following respecting a political contribution:

> "In our view, a contribution is protected *as an expression by the contributor*, not because the contribution eventually may be used by a candidate to express a particular message. The money may never be used to promote a form of expression by the candidate; instead, it may (for example) be used to pay campaign staff or to meet other needs not tied to a particular message. However, the contribution, in and of itself, is *the contributor's expression of support for the candidate or cause* -- an act of expression that is completed by the act of giving and that depends in no way on the ultimate use to which the contribution is put."

*Id.* at 522 (emphasis in original).

Similarly, the court equated a citizen's act of making a political contribution with a pure expression of opinion supporting a political candidate or cause:

> "If, instead of giving a contribution, a citizen stood on a street corner and announced, 'I support candidate X,' there would be no doubt that that message constituted an expression of general support for that candidate, as well as a more particular message: 'X deserves your vote.' From the perspective of the contributor, the contribution is the same kind of message as is the street corner announcement."

*Id.* at 524.

The *Vannatta I* court in those passages appears to have implied a political communication from an act -- delivering money to a campaign -- whether or not any

4

evidence supported that implication and despite evidence that the money never supported any political expression by either the donor or the recipient.  Whether and to what extent the court's conflicting statements about constitutional protections for contributions and expenditures reflected a binding holding of the court was further complicated by the fact that the Secretary of State *conceded* that campaign expenditures constituted free speech. *Id.* at 520, 542.  That concession obviated any need for a court decision on the question. The court's answer was, therefore, *dictum*.

Nonetheless, the court summarily swept away the difficulties regarding its analysis with one absolute and legally unnecessary conclusion:

"From the foregoing discussion, we conclude that both campaign contributions and expenditures are forms of expression for the purposes of Article I, section 8."

*Id.* at 524 (footnote omitted).  And that sentence from *Vannatta I* has been repeated by this court as if the more nuanced passages in *Vannatta I* did not exist.  For example, *Meyer v. Bradbury*, 341 Or 288, 299, 142 P3d 1031 (2006), states:

"Under Oregon law, both campaign contributions and expenditures are forms of expression protected by that constitutional provision [Article I, section 8], thus making legislatively imposed limitations on individual political campaign contributions and expenditures impermissible.  *See Vannatta v. Keisling*, 324 Or 514, 524, 931 P2d 770 (1997) (so holding)."

The majority simply repeats again, with no separate analysis, the same absolute statement from *Vannatta I* and, later, *Meyer*, that shrouds rather than reveals this court's actual reasoning in *Vannatta I*.  Thus, according to the majority,

"[O]ur holdings in *Vannatta I* and *Meyer* establish that, at the time that the voters considered Measure 47, campaign contributions and expenditures in Oregon were constitutionally protected forms of expression, and the

5

legislature could not limit them."

___ Or at ___ (slip op at 10).

The majority's reliance here on the absolute declaration, quoted above, in *Vannatta I* is not correct. This court already has begun to reconsider and pull back from that absolute statement. In *Vannatta v. Oregon Government Ethics Comm.*, 347 Or 449, 464, 222 P3d 1077 (2009) (*Vannatta II*), this court acknowledged the extreme nature of the statement in *Vannatta I*, but attempted to clarify and explain it, and, I submit, to alter it. Thus, *Vannatta II* declared that the statement in *Vannatta I* that a campaign contribution constituted free speech regardless of the ultimate use to which the contribution was put

> "was unnecessary to the court's holding. On further reflection, we conclude
> that that observation was too broad and must be withdrawn. Second,
> because *Vannatta I* assumed a symbiotic relationship between the making
> of contributions and the candidate's or campaign's ability to communicate a
> political message, this court did not squarely decide in *Vannatta I* that, in
> every case, the delivery to a public official, a candidate, or a campaign of
> money or something of value also is constitutionally protected expression
> as a matter of law."

*Vannatta II*, 347 Or at 465. *Vannatta II* makes it clear that this court already has begun the process of reconsidering the absolute position voiced in *Vannatta I* and, as a consequence, to focus the free speech analysis under Article I, section 8, on whether a financial contribution in fact constitutes not merely a delivery of property but an act of protected expression by the donor.

Aside from the problems already noted, the court's reasoning in *Vannatta I* for its absolute conclusion seems suspect. A campaign contribution, as noted, is a gift of

6

property. A delivery of property may be accompanied by a donor's protected expressions of political or personal support, but that constitutional protection pertains to the donor's words, not the delivery of property by itself. It may be possible to imagine circumstances in which the delivery of an article of property or money might constitute expression, perhaps akin to wearing a black armband. But an act -- giving property to another -- that does not constitute free speech in most conceivable contexts is not transformed into protected speech simply because the donee is a candidate or campaign and the donor is a political supporter. The answer cannot consist of categorically pronouncing, as the court did on occasion in *Vannatta I*, that contributing political money constitutes speech always or even most of the time. Rather, the answer depends on a careful examination of all the circumstances to determine whether and to what extent the conduct of giving or spending political money itself constitutes a protected expression.

Some campaign expenditures might readily qualify as protected free speech. The *Vannatta I* court's example of individuals or neighbors banding together to publish political advertisements, either directly or through a retained professional ad producer, describe instances of spending behavior that has a logical nexus to political speech. The legislature may attach regulatory duties concerning, for example, the disclosures of sources and amounts of such expenditures, but it is doubtful that conventional laws simply could limit the number of supportive ads that an individual, a candidate, or a campaign could purchase without violating Article I, section 8.

However, the *Vannatta I* court's hypothetical about the purchase of advertising does not support the broad conclusion that every monetary expenditure by a

candidate or campaign constitutes free speech.  For example, a campaign operative's use of campaign funds to purchase ordinary consumer goods, without more, does not constitute free speech simply because the purchaser is a political campaign organization or because the expenditures will help campaign workers perform specific campaign tasks. The fact that every campaign worker, while spending campaign funds, may hope that their candidate wins an election does not turn every expenditure of campaign money into an act of free speech.  The *Vannatta I* court did not assist in the task of determining how to identify the necessary nexus between a political expenditure and free speech by positing too-easy hypotheticals that plainly sidestep the more difficult issues involved in analyzing free speech issues.[2]

---

[2] This court must engage in a separate analysis of the distinct acts of *contributing* money to a campaign and *spending* money that a candidate or campaign has received from donors.  Making a contribution to a candidate or campaign is conduct, and the court's analytical focus is whether that conduct amounts to constitutionally protected expression by the donor when the donation occurs.  The answer does not depend on whether the recipient, *i.e.*, the candidate or campaign, will benefit generally from the donation or use the money later to engage in political speech.

The expenditure of money by a candidate or campaign similarly is conduct, and the court's analytical focus is whether the conduct constitutes expression.  Some expenditures will have an obvious nexus to political advocacy, such as purchasing advertising space in a newspaper or air time from a radio or television station for a political spot.  Any limitation on those expenditures clearly would stifle protected speech, but the same is not true for other campaign expenditures that have little or no tie to expression on any subject.  The fact that an expenditure originates with a campaign does not demonstrate automatically that Article I, section 8, protects it as free expression. *Vannatta I* failed to engage in the careful analysis of those separate kinds of actions that Article I, section 8, demands.

8

Some academic commentators have begun to focus attention on the dearth of logical support for broad judicial pronouncements that, without any consideration of factual context, declare that the giving or spending of political money constitutes protected political speech. For example, Professor Deborah Hellman has stressed the importance of avoiding easy assumptions about whether contributing money to a candidate or campaign constitutes protected expressive conduct simply because the money might facilitate a political expression at some other place or time:

> "While money surely facilitates speech, the facilitative function of money is not sufficient to show that restrictions on giving and spending money constitute restrictions on speech. Instead, I argue that while the fact that money helps people to speak is relevant to the issue of whether restrictions on giving and spending money restrict speech, the question is complex and involves consideration of other important factors. Money facilitates the exercise of many other rights as well. Sometimes spending money in connection with a right is treated as a part of the right, and sometimes it is not. When we note this fact, we see that a more comprehensive account is necessary to determine when the right to spend or give money should be treated as part of a First Amendment right. Spending money surely facilitates speech -- about that the *Buckley*[3] Court is right. But to move from the obviously true claim that money facilitates speech to the controversial claim that restrictions on spending money are restrictions on speech requires much more."

Deborah Hellman, *Money Talks but It Isn't Speech*, 95 Minn L Rev 953, 974 (2011). In my view, this court should be particularly sensitive to the need to reassess its past statements concerning the impact of the constitution on the giving and spending of political money because the exact scope of the legislature's authority in that area turns on

---

[3]     *Buckley v. Valeo*, 424 US 1, 16, 96 S Ct 612, 46 L Ed 3d 659 (1976).

9

the answer.

This court has expressed its willingness to reconsider prior interpretations of the state constitution or statutes under the correct circumstances. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000), states:

> "Consistent with the foregoing, we remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question. We will give particular attention to arguments that either present new information as to the meaning of the constitutional provision at issue or that demonstrate some failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question."

This court further articulated the criteria that it will follow in deciding whether to alter or abandon a prior constitutional ruling in *State v. Ciancanelli*, 339 Or 282, 291, 121 P3d 613 (2005). Those criteria include whether the rule was not formulated by means of the appropriate paradigm or some suitable substitute, and whether the application of the correct paradigm would confirm that the challenged constitutional rule was incorrect. *Id.* The court also inquires whether, due to the passage of time and the precedential use of the rule, overturning the challenged rule would unduly cloud or complicate the law. *Id.*; *see also State ex rel Huddleston v. Sawyer*, 324 Or 597, 640-41, 932 P2d 1145 (1997) (Durham, J., concurring in part and dissenting in part) (discussing application of rule of *stare decisis*) (citing *Safeway Stores v. State Bd. of Agriculture*, 198 Or 43, 255 P2d 564 (1953)).

The Hazell plaintiffs question the correctness of *Vannatta I*, but their effort here falls short of what is necessary under the cases just discussed to overcome the usual

10

effect of *stare decisis*. If future litigation presents that question to this court, this court will consider that issue only if the plaintiffs preserve their arguments in the lower courts and present their challenge in the manner prescribed by this court's precedents.

The majority declines to address even the brief challenge that the Hazell plaintiffs present here, relying on the assertion that those plaintiffs, due to the generality of their requested relief, have failed to identify an actual and substantial controversy between the parties. Setting aside the inadequacies of the Hazell plaintiffs' challenge to *Vannatta I*, or their attempt merely to distinguish that case from the circumstances posed here, the majority's answer is not correct.

The majority agrees that the Hazell plaintiffs have standing to assert their claims. Or at ___ (slip op at 12). The Hazell plaintiffs' contend in their complaint that the action of the Secretary of State has harmed them irreparably because they are now deprived of important information on the sources and amounts of money contributed to and used by candidates for public office and their campaigns. They point to the text of Measure 47, which would create reporting obligations for candidates, political committees, political parties, and individuals, and compel the Secretary of State to receive and publish to the public all reports of campaign contributions and expenditures in an accessible, computer-based format.

We are obligated, in construing the complaint, to accord the Hazell plaintiffs the benefit of every favorable inference that is available from their allegations. Applying that rule, it is a simple step to recognize that the Hazell plaintiffs seek the specific disclosure of political campaign information concerning contributions and

11

expenditures to remedy what they assert is their irreparable injury. The Secretary of State was able to evade her specific obligation under Measure 47, section (8)(c) to supply that information to the Hazell plaintiffs by declaring Measure 47 dormant and inoperative.

This court recently summarized the considerations that it addresses in deciding whether a controversy is justiciable:

> "'Justiciability is a vague standard but entails several definite considerations. A controversy is justiciable, as opposed to abstract, where there is an actual and substantial controversy between parties having adverse legal interests. The controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue. A justiciable controversy results in specific relief through a binding decree as opposed to an advisory opinion which is binding on no one. The court cannot exercise jurisdiction over a nonjusticiable controversy because in the absence of constitutional authority, the court cannot render advisory opinions.'"

*Pendleton School Dist. v. State of Oregon*, 345 Or 596, 604, 200 P3d 133 (2009) (quoting *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982)) (citations omitted in original).

Applying the criteria described in *Pendleton School Dist.* and *Brown*, it is clear that the Hazell plaintiffs have alleged a justiciable controversy. The Hazell plaintiffs assert, among other things, that defendants, the Secretary of State and the Attorney General, erred in declaring that Measure 47 was not in effect. They also allege that, due to defendants' conduct, they are now irreparably injured by their inability to receive the campaign reports and information that Measure 47 obligates defendants to receive and publish. If the court were to declare Measure 47 legally effective, the Hazell plaintiffs would receive immediate relief from their claimed irreparable injury in that Measure 47 would obligate the Secretary of State to provide the campaign information

12

that the Hazell plaintiffs seek. Thus, a declaration of law in the Hazell plaintiffs' favor would resolve a dispute concerning present, not hypothetical, facts, and would result in specific relief that would bind the Hazell plaintiffs and defendants. A declaration of law in the Hazell plaintiffs' favor would not produce a mere advisory opinion that would bind no one.

I conclude, contrary to the majority, that the Hazell plaintiffs have pleaded a justiciable controversy that should result in a declaration of law about whether Measure 47 is legally effective. The court should decide the question of whether and to what extent the people, exercising their power of initiative, may place regulatory limits on campaign contributions and expenditures. Because this court authored *Vannatta I*, only this court can decide whether that decision misinterpreted the effect of Article I, section 8, on legislative authority to enact campaign finance regulations and, thus, whether the limitations in Measure 47 on campaign contributions and expenditures are consistent with the Oregon Constitution.

For the reasons expressed above, I concur in the dismissal of the complaint of the Horton plaintiffs. I dissent from the majority's dismissal of the complaint of the Hazell plaintiffs due to an asserted lack of a justiciable controversy between the parties.